JUDGE ENGELMAYER

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CIVIL No. **12 CIV 6969**

KALIMANTANO GmbH;
(a company under the laws of Germany)
TOFIK DAVIDOFF;
KONSTANTIN FELDE
(both German citizens)

    Plaintiffs

-against-

MOTION IN TIME, INC.
(a New York corporation);
EDDIE SHAMAYEV, d/b/a EDDIE
JEWELRY, INC.; d/b/a AMRUS
JEWELRY, INC.;
MICHAEL SHAMAYEV;
BORIS SHAMAYEV;
DAVID SHAMAYEV
(all four residents of New York State)

and DOES from 1 to 100

    Defendants

**COMPLAINT**

**FOR COLLECTION OF CONVERTED
FUNDS, FOR ORDERS,
DECLARATORY JUDGMENT,
DAMAGES, INJUNCTIVE AND
OTHER RELIEF BASED ON:**

**1. RACKETEERING INFLUENCED
AND CORRUPT ORGANIZATION
ACT;
2. CONVERSION;
3. MONEY HAD AND RECEIVED;
4. FRAUDULENT CONVEYANCES;
5. FRAUD;
6. MISREPRESENTATION;
7. CIVIL CONSPIRACY;
8. UNJUST ENRICHMENT;
9. DECLARATORY RELIEF;
10. DEFAMATION;
11. DAMAGE TO BUSINESS
REPUTATION;
12. INJUNCTIVE RELIEF**



RECEIVED
SEP 14 2012
U.S.D.C. S.D. N.Y.
CASHIERS

## I.  NATURE OF ACTION

    This is an action to collect $120,000 and €135,000 (Euros, the European Union currency), that Defendants received from or through Plaintiffs on false pretenses, then converted, and have since refused to return.  Plaintiff further seeks that the Court's judgment against Defendants to award various other damages on multiple causes of action, as well as for the orders including for injunctive relief.

1

## II.  PARTIES.

1.     Plaintiff KALIMANTANO GmbH (hereinafter also "KALIMANTANO")
is a company incorporated in the Federal Republic of Germany, with main offices at:
Louisen Strasse 98, 61348, Bad Homburg, Germany.  KALIMANTANO, located in one
of the suburbs of Frankfurt am Main (also known as Frankfurt), is in the business of
foodstuffs' wholesale and supplies to stores and customers in Germany.  The operating
and sales website of KALIMANTANO in Germany could be found at this link:
www.kalimantano.de.  That company, founded in 2001, has been in good standing in
Germany at all times relevant hereto; it has the following company registration
information: HRB 11537, Amtsgericht Bad Homburg, tax ID 00323705022, Ust - Id Nr.
DE 813474195.

2.     Plaintiff TOFIK DAVIDOFF (hereinafter also "DAVIDOFF") is a
German citizen.  DAVIDOFF is a businessman, one of KALIMANTANO's operating
managers and principals.  His address for purposes of this action is: c/o Kalimantano
GmbH, Louisen Strasse 98, 61348, Bad Homburg, Germany.   As shown below,
DAVIDOFF paid from KALIMANTANO's account $120,000 to the account of
Defendants at Bank of America, but received no merchandise that he ordered.
DAVIDOFF was also an intermediary in the sale of a certain watch to the end customers.
Those customers paid to Defendants for that watch item that turned out to be used,
defective, and not duly certified, as described more in detail below.

3.     Plaintiff KONSTANTIN FELDE (hereinafter also "FELDE") is a German
businessman, one of the operating managers of KALIMANTANO.  His address, for
purposes of this action, is: c/o Kalimantano GmbH, Louisen Strasse 98, 61348, Bad
Homburg, Germany.  Among other reasons for being Plaintiff herein, FELDE has been

2

designated by the ultimate customers as the trustee for the purposes of returning of a particular defective watch, cited above, and transferring the refund.  That item should be returned back to Defendants subject to obtaining from Defendants the refund of the moneys paid for it, namely €135,000, as described more in detail below.

4.      Defendant MOTION IN TIME, INC. (hereinafter also "MIT") is a corporation registered in the State of New York, at the address: 56 West 47 Street, New York, NY, 10036, which also stands for its shop's location.    The New York State Division of Corporations' database shows that it was incorporated on January 24, 2004, #2998638, at the above address, with no registered agent.  MIT is in the retail business of selling, buying and reselling jewelry and expensive watches, both at its shop at the above address and through its website: www.motionintime.com.  MIT has also been regularly using for its sales direct e-mail advertisements and direct proposals to buy certain items, circulated both as solicited and unsolicited e-mails.

5.      Defendant EDDIE SHAMAYEV, aka Edward Shamayev, aka Eduard Shamayev, aka Eddie Shamay (hereinafter "SHAMAYEV") is a principal and founder of MIT, mentioned above, and is either a salesperson at his shifts or alternatively a supervisor for the salesperson therein.  On information and belief, SHAMAYEV is an immigrant, originally from Tajikistan, one of the Republics of the former USSR. SHAMAYEV resides in New York.  His address, for purposes of this action, is: c/o Motion in Time, Inc., 56 West 47 Street, New York, NY, 10036.

6.      SHAMAYEV has also been doing business under at least two corporate names, neither of which is in good standing in New York, but which he occasionally used for his business purposes in the recent times.  Namely, he was the principal of Eddie Jewelry, Inc., incorporated on May 1, 1989, #1348696, at the registered address: 524

Fulton Street, Brooklyn, New York, 11201.  On information and belief, it was dissolved in 1993, but SHAMAYEV still continued to use that trading name, from time to time. SHAMAYEV has also been doing business under the trading name AmRus Jewelry, Ltd. (the full trading name stands for American-Russian Jewelry), incorporated in New York on February 26, 1992, at the address: c/o Robert Race, 100 East 17th Street, New York, NY, 10003.  On information and belief, it was dissolved in 2004.  However, that dissolved corporation is still being sued at this time, in the case pending in the Supreme Court of New York (*United Diamonds Int., Inc. v. Amrus Jewelry et al.*, TS-300366-06/NY).  SHAMAYEV is a also a defendant in a number of lawsuits, claiming damages against him for conversion (for example, *Bvlova Corporation v. Eddie Shamayev*, Queens County Superior Court, CV-097681-06/QU).

7.      SHAMAYEV has been, on information and belief, the driving force of the racketeering conspiracy, alleged and described herein.  In particular, SHAMAYEV's activities, targeting at Plaintiffs' safety, culminated in his making a phone call to DAVIDOFF in Germany in the night from June 14 to June 15, 2012, threatening to contract murder of DAVIDOFF, to physically harm his family members, and to destroy KALIMANTANO's business.

8.      Defendant MICHAEL SHAMAYEV, aka Mikhail Shamayev, aka Mihail Shamayev, aka Mikhail Shamay (hereinafter "MICHAEL") is SHAMAYEV's brother and one of the principals of MIT, also working at its store as a salesperson.  MICHAEL also resides in New York.  For purposes of this action, his address is: c/o Motion in Time, Inc., 56 West 47 Street, New York, NY, 10036.  MICHAEL has been linked to another address as well: Forrest Hills 105-21, 66 Avenue, New York, NY, 11375.  MICHAEL is a defendant in this action, because, inter alia, he was the person who obtained in

Frankfurt, Germany, on false pretenses, €143,000 in cash, while selling and handing over a defective item, a watch.  That watch turned out to be used.  While subsequently facing the demand of returning the item and of the refund, MICHAEL engaged, with the other Defendants, in the extortionist campaign seeking to coerce Plaintiffs to abandon their lawful claims for the return of the item back to MIT and for the refund of the money paid for it in Frankfurt.

9.     Defendant BORIS SHAMAYEV, aka Boris Shamay (hereinafter "BORIS") is SHAMAYEV's son and one of MIT's principals, on information and belief, also working at its store as a salesperson.  Boris also resides in New York.  For purposes of this action, his address is: c/o Motion in Time, Inc., 56 West 47 Street, New York, NY, 10036. BORIS has also been allegedly the member of the racketeering enterprise.  In particular, BORIS was the person who initiated various e-mails that constituted wire frauds and made a number of phone calls from New York, targeting Plaintiffs.  BORIS likewise engaged in a conspiracy with the other Defendants, to pursue extortionist activities.

10.     Defendant DAVID SHAMAYEV, aka David Shamay (hereinafter "DAVID") is SHAMAYEV's other son, who is also one of MIT's principals, on information and belief, also working at its store as a salesperson.  DAVID also resides in New York.  For purposes of this action, his address is: c/o Motion in Time, Inc., 56 West 47 Street, New York, NY, 10036.  DAVID has also been allegedly the member of the racketeering enterprise.  In particular, DAVID was the person who construed various defamatory websites, targeting Plaintiffs, and engaging, in a conspiracy with the other Defendants, in extortionist activities, for purposes of retaining the moneys obtained on false pretenses.

## II. JURISDICTION.

11.     This Court has jurisdiction because of the diversity of citizenship pursuant to 28 U.S.C. §1332.   For purposes of jurisdiction, all three Plaintiffs are either incorporated in, or citizens and residents of the Federal Republic of Germany.

12.     For purposes of the diversity of citizenship, all four Defendants are citizens of the State of New York, with the registration and/or residential addresses in the State of New York, i.e. different from Plaintiffs' location overseas.

13.     The amount in controversy, exclusive of interest and costs, is in excess of the statutory minimum of $75,000.

14.     Jurisdiction of this Court is proper in light of the question of the federal law in this action, i.e. the claims asserted against Defendants herewith under the Racketeering Influenced and Corrupt Organization Act, 18 U.S.C. §1961 *et seq*.

15.     Jurisdiction of this Court is proper because it may grant and enforce relief of preliminary and of permanent injunction sought in this action against the residents of the State of New York, whose main place of business is within the boundaries of the Southern District of New York, i.e. the proper judicial district.

16.     Venue is also proper because Defendant MIT is a corporation registered and existing under the laws of New York, with the registered office in New York City. Likewise, the individual Defendants, who, on information and belief, work at MIT's store, reside either in New York, New York, or in Brooklyn, New York.

## III.  UNDERLYING FACTS.

A.  Circumstances of Defendants' Obtaining Purchase Orders By False Pretenses.

17.     The family of the immigrants from Tajikistan, one of the Republics of the former Soviet Union, the SHAMAYEVS, has been, on information and belief, in the

business of selling, buying and reselling jewelry in the State of New York, particularly in New York and in Brooklyn, for almost two decades.  Its initial customers were primarily also immigrants from the former USSR, and therefore their business/trading name in use was AmRus Jewelry, Ltd. (American-Russian Jewelry).  At a later time, the SHAMAYEVS expanded and diversified their clientele beyond the Russian-speaking immigrants' community in New York.

18.     The SHAMAYEVS' family worked, at all relevant times, at the jewelry store, whose main staff consisted, on information and belief, of SHAMAYEV, his brother MICHAEL, as well as SHAMAYEV's sons BORIS and DAVID.

19.     In or about 2006, the SHAMAYEVS opened a store at the prime location in Manhattan, at 56 W 47th Street, New York, NY, 10036, in the so called 'diamonds district', in proximity of numerous other jewelry shops, boutiques, and businesses.

20.     In addition to selling, buying and reselling jewelry, the SHAMAYEVS also have been offering the watches' repairs and they have also been selling watches of expensive brands.  Selling watches has been becoming the SHAMAYEVS' prime occupation over the years.  After the incorporation of MIT in 2006, their business went mostly under that new trading name, used on their shop.

21.     The SHAMAYEVS extended their retail business, operated out of their shop, by offering watches and jewelry online, through their website, as mentioned above, www.motionintime.com.  On information and belief, the SHAMAYEVS obtained or bought from different sources the lists of e-mails of potential buyers and customers and undertook the direct mailing of their offers by circular e-mails upon the lists that they obtained from different sources.  The usual e-mails offered very big discounts (up to

65%) on watches, such as Cartier, Patek Philippe, Chopard, Perrelet, Hublot, Omega, Breguet, Roger Dubuis, et al.

22.     On information and belief, neither the SHAMAYEVS, nor the corporations associated with them, i.e. MIT and two other corporations, currently dissolved, AmRus Jewelry, Ltd. and Eddie Jewelry, Ltd., have ever been authorized to act as retailers of any of those luxury brands of watches.  Despite the apparent lack of permissions or certification, MIT's circular e-mails, offering particular watches produced in limited series, were designed in a manner that was calculated to draw an inference that MIT was an authorized retailer for those brands and producers.

23.     SHAMAYEV and others from his family associated with the MIT store, as enumerated above, have been subject to a number of lawsuits in the Supreme Court of New York, in Manhattan, and other courts in the State of New York.  Some of the lawsuits were associated with their three corporations, i.e. MIT and two dissolved entities.

24.     One of those who were receiving the direct marketing and promotional e-mails from MIT, including announcements of 'blowout sales' of watches, was a German businessman, DAVIDOFF.  Since about 2009, DAVIDOFF was periodically receiving MIT's e-mails offering very unusual discounts on the watches of the luxury brands such as Cartier, Patek Philippe, Chopard, Perrelet, Hublot, Roger Dubuis, et al.

25.     As mentioned above, many of those e-mails sent by SHAMAYEVS contained promotional messages: "Blowout Price!!!!", etc.  On information and belief, those promotional e-mails were misleading.  Namely, the watches offered through e-mails were not what for real, either being not new, or after repairs, or simply unavailable when an order would be placed, whereas alternatives would be offered instead.

26.     In December of 2011, DAVIDOFF was approached by his trading counterparts in Kazakhstan, asking him to assist them in locating good deals on luxurious watches.   To DAVIDOFF's misfortune, leading to his subsequent nightmarish experience, DAVIDOFF was unlucky to recall about those promotional e-mails with offers from MIT and SHAMAYEVS and get back to them.

(B) Defendants' Fraud of Selling a Defective Item for Cash in Frankfurt.

27.     In December of 2011, DAVIDOFF, acting in the interests of his trading counterparts in Kazakhstan, arranged for the purchase of an expensive watch of the Swiss brand 'Patek Philippe', model 5970, offered to him by the SHAMAYEVS through MIT's e-mails.

28.     Relying on the representations made by SHAMAYEV, MICHAEL and BORIS, then DAVIDOFF arranged for the trip to Frankfurt, Germany, of his customers from Kazakhstan, Nurgali Dossanbayev (hereinafter "Dossanbayev"), Ruslan Azizov (hereinafter "Azizov") and Spiro Mantidi (hereinafter "Mantidi").   Dossanbayev, Azizov and Mantidi were also to come to buy other luxury watches in the stores in Frankfurt.

29.     The SHAMAYEVS and MIT, on the one hand, and DAVIDOFF, on the other hand, agreed that MICHAEL would also fly from New York to Frankfurt, Germany, to bring the offered watch, to meet with the end customers and to consummate the sale.   Specifically, at no time before his arrival in Frankfurt did the SHAMAYEVS indicate that they would require for that item the payment in cash and not through a bank.

30.     MICHAEL asked for, and obtained from KALIMANTANO, a refund for buying his round trip flight from New York to Frankfurt, Germany, based upon his presentations that he would bring for sale the certified item in an immaculate condition. See Exhibit D.

31.     On January 4, 2012, at about 10 A.M., DAVIDOFF met MICHAEL at the airport in Frankfurt and brought him to Hilton Hotel in Frankfurt (at the address Hoch Strasse 4), Room 426, reserved and paid for by KALIMANTANO.  See Exhibit D-E.

32.     Also on January 4, 2012, later in the same morning, DAVIDOFF's associate FELDE met at the airport three incoming customers from Kazakhstan, namely Dossanbayev, Azizov and Mantidi.  FELDE also brought them to the same Hilton Hotel.

33.     At first joint meeting in the lobby of the hotel, MICHAEL met with DAVIDOFF, FELDE, and three incoming customers from Kazakhstan who just arrived from the airport.

34.     MICHAEL then demonstrated to them the watch, Patek Philippe, model 5970, and demanded from the buyers "to show the money".

35.     The customers, Dossanbayev, Azizov and Mantidi, asked MICHAEL to explain what he meant by that because, obviously, nobody carried cash in such amounts. Furthermore, MICHAEL never made that proposition to require cash at any time before he met with the customers at the hotel.  The incoming customers offered to pay from a bank account to MIT's bank account.

36.     MICHAEL thus, unexpectedly, declined to sell that watch, Patek Philippe, that he showed, other than for cash.

37.     Having discussed the developing unexpected situation, Dossanbayev, Azizov and Mantidi made phone calls to Kazakhstan, making the arrangements for an urgent availability of the cash on two accounts, in the name of Dossanbayev and Azizov. The arrangement was made that they could use those two accounts in their names for withdrawing cash from banking branches of Commerzbank and from ATM machines in Frankfurt.

38.     Upon their telephone calls to their associates back in their home country, the money was thus promptly made available on their two accounts at BTA Bank in Kazakhstan, for cash withdrawals in Germany.

39.     Experiencing great inconvenience and losing on bank fees for the ATM transactions, normally limiting a withdrawal by €2,000 at a time, Dossanbayev and Azizov were compelled to visit a number of branches and use ATMs in Frankfurt, in order to promptly withdraw the necessary money in cash in Euros.

40.     Plaintiffs have the full banking records from BTA Bank that prove all those transactions and withdrawals of cash by Dossanbayev and Azizov.  Those banking records show the cash withdrawals, with the precision of time up to a minute and up to a second, including the address of the bank branch or of the ATM machines.

41.     Upon withdrawing the necessary money in cash, the visitors returned to the Hilton hotel to meet with MICHAEL and complete the purchase of the item that MICHAEL had shown.  The price was €143,000, calculated to match $175,000 at the exchange rate of the day.

42.     DAVIDOFF and FELDE accompanied Dossanbayev and Azizov to the room, where MICHAEL was staying, Room No. 426.

43.     MICHAEL then counted the tendered cash in Euros, in the presence of four persons: DAVIDOFF, FELDE, as well as the foreign buyers, Dossanbayev and Azizov.

44.     Upon physically counting, by hand, €143,000 (in the Euros) in his room, MICHAEL confirmed that the amount tendered in cash was correct, and then passed the watch, Patek Philippe, 5970, in a box.  MICHAEL assured that the watch was new,

certified and in an impeccable condition.    The customers relied on MICHAEL's assurances.

45.    MICHAEL also paid a commission of €8,000 to DAVIDOFF as an intermediary for that sale, for connecting him to the ultimate buyers and organizing the meeting.

46.    After that purchase was consummated, DAVIDOFF invited all the participants to the restaurant called 'The Ivory Club' at Taunusanlage 15, D-60325, in Frankfurt.  The participants at the dinner included DAVIDOFF, his wife, MICHAEL, and Azizov.  They all dined from about 7 P.M. to 11 P.M., in a very friendly mood.  At no time did MICHAEL express any allegations against DAVIDOFF at the dinner or at any time in Germany.

47.    Apart from the purchase from MICHAEL, Dossanbayev and Azizov requested DAVIDOFF to bring them to a few jewelry and watches stores in Frankfurt, where they bought before their departure on the next day more watches.

### (C) Defendants Obtaining $120,000 by Wire on False Pretenses

48.    On the next day, January 5, 2012, DAVIDOFF discussed with MICHAEL making two more purchases from him.

49.    One order was for one more watch 'Patek Philippe' 5970, and another for Audemars Piguet Montoya watches (500 pieces).

50.    Against MIT's invoices showing those items, DAVIDOFF made on that day two wire transfers for the prepayment of the advance on those items, for $50,000 and $70,000, in two separate wire transfers to MIT's account at Bank of America, made from KALIMANTANO's account at Commerzbank in Frankfurt.  See Exhibits A-C.

51.     Exhibits A and B annexed to the Complaint represent the banking records showing those advance payments for those orders, for the total of $120,000.  The balance was to be paid by KALIMANTANO upon the actual delivery of the ordered items from MIT, eventually again to Frankfurt.

52.     In the evening of January 5, 2012, MICHAEL took the return plane to New York.  MICHAEL had at his disposal €135,000 in cash after the sale of the watch.

53.     On information and belief, MICHAEL carried that cash in the amount of €135,000 received from the customers on the eve, to the plane.  Given the tight schedule of MICHAEL's trip, Plaintiffs believe that it was highly unlikely that MICHAEL would have deposited that cash with some bank in Frankfurt.

54.     Given the subsequent events, Plaintiffs now believe that, having carried cash in the amount of €135,000, received from the customers, MICHAEL failed to report that money in the U.S. Customs and Border Protection form (6059B Form), answer to question #13, at the time of the reentry of the U.S. border in New York.

55.     Dossanbayev and Mantidi also took their flight to Kazakhstan, carrying the purchase from MICHAEL and other purchases.  Azizov stayed for one more day.

56.     Later in January, DAVIDOFF repeatedly contacted MIT and the SHAMAEVS, asking for his new orders, for which he had wire transferred the advance payment, ready to pay the balance.  Each time, he got an explanation from the SHAMAYEVS and MIT that his two new orders were not yet ready for delivery.

(D) Defendants' Staging a Smearing Campaign and Making Extortionist Threats.

57.     Entirely unexpectedly to DAVIDOFF, FELDE and KALIMANTANO, the customers and buyers, Dossanbayev and Azizov, contacted them and advised that the

Patek Philippe watch, model 5970, that they had purchased from MICHAEL, was actually a used watch and that its production firm's seal was not intact nor a genuine one.

58.     More specifically, those customers advised DAVIDOFF that, having developed suspicions, they had shown the watch for inspection at one of the authorized retailers, who traced the watch's identification number, and determined that that watch was not a new one and was produced by Patek Philippe back in 2010.

59.     Because the production seal was not genuine, even although crafty replicated, the reasonable presumption was that that watch had also been repaired, while there existed no other reasons for breaking the firm's seal and opening the watch and then sealing it back.

60.     The customers in Kazakhstan, the buyers of that watch, thus demanded to return the watch, Patek Philippe, 5970, back and to return the funds that they paid in Frankfurt.

61.     DAVIDOFF and KALIMANTANO immediately turned over that matter to MICHAEL, SHAMAYEV and BORIS, as well as MIT, asking for the required explanations and demanded to return the questionable watch and to refund the moneys paid for it.

62.     SHAMAYEV, MICHAEL and BORIS vaguely denied that the watch was not new and repaired, but failed to provide the documentary proof that the item in question was certified as a new itme.  They declined to accept that watch back and to return the money MICHAEL received for it in Frankfurt.

63.     Furthermore, SHAMAYEV, MICHAEL and BORIS, completely changing their story, started to belatedly fraudulently claim that MIT's account at Bank of America never was credited with $120,000 towards the new purchase of the items ordered by

DAVIDOF and KALIMANTANO on January 5, 2012. However, the wire transfers money was never returned back to KALIMANTANO through the banking channels and those moneys were almost certainly credited on MIT's account.

64.     DAVIDOFF's telephonic inquiries from MIT were met with an ever growing irritation and aggressiveness on the part of the SHAMAYEVS, who started to falsely accuse DAVIDOFF and MIT of various frauds, all without any substance, knowing that their accusations were invented and false.

(E) Threats to Plaintiff Including to Contract Murder, to Cause Bodily Harm.

65.     Furthermore, the SHAMAYEVS started to make threats to DAVIDOFF, stating that his safety would be in jeopardy, unless DAVIDOFF dropped the refunds' matter and unless he and KALIMANTANO wrote off all the losses that they incurred through MIT. Those threats included coercing the German Plaintiffs to abandon the advance payment by KALIMANTANO of the $120,000, as though MIT never received it, which was untrue.

66.     Those repeated threats by the SHAMAYEVS to DAVIDOFF culminated in SHAMAYEV's phone call to DAVIDOFF that was made on June 14, 2012 at 11:59 P.M. local time in Germany, i.e. 5:59 PM EST in New York. As the phone records show, that conversation, initiated by SHAMAYEV, lasted 11 minutes.

67.     In that phone call that SHAMAYEV initiated from his phone in New York, knowing that it was already night-time in Germany, SHAMAYEV made threats and shouted vulgar obscenities, with the most menacing tonality and implications.

68.     Specifically, SHAMAYEV threatened DAVIDOFF that he would physically harm and crush DAVIDOFF and his family, that he would destroy DAVIDOFF and his family. Furthermore, SHAMAYEV also said that he could contract

murdering DAVIDOFF.  SHAMAYEV also engaged in a litany of vulgar obscenities addressed to DAVIDOFF and even his family, shouting on the phone that DAVIDOFF was a thief, fraudster, child molester, homosexual pervert, and the like obscenities.  All of those insults shouted by SHAMAYEV were obviously untrue.   For example, DAVIDOFF had built a good business reputation in Germany, he was never convicted or charged of any offenses; and he has had a strongly bonded family and he was a family-oriented man.

69.     On the next day, June 15, 2012, at 9:51 A.M. in Germany, DAVIDOFF wrote back to SHAMAYEV an e-mail (which is available), to memorialize that conversation, namely that SHAMAYEV had made insults, threats to him and to his family.  DAVIDOFF reflected the contents in nine points, reflecting the substance of that telephonic conversation initiated by SHAMAYEV during the night-time in Germany.

70.     On June 18, 2012, KALIMANTANO and DAVIDOFF lodged with the Attorney General of Hessen Province (Land) in Germany, with main offices in Frankfurt, the criminal complaint against the SHAMAYEVS.

71.     The Attorney General's Office of Hessen Province opened the criminal inquiry against the SHAMAYEVS, including against BORIS, which was confirmed by the letter to KALIMANTANO of June 29, 2012, docket No. 8208.  See Exhibit F.

   (F) Defendants' Launching Defamation Campaign against Plaintiffs on the Internet

72.     In response to the initiation of the criminal proceedings in Germany, the SHAMAYEVS caused a most denigrating campaign launched against DAVIDOFF on the Internet.

73.     On information and belief, the SHAMAYEVS purchased a website domain, www.tofikdavidoff.com, creating a website with the headlines "Tofik Davidoff:

A Man You Can't Trust".  On that website, misusing another person's name, the SHAMAYEVS posted a so called "Stolen Watch Alert".  They falsely accused DAVIDOFF as though he had "stolen" the watch, Patek Philippe, Ref. No. 5970P-001, Serial No. 3931765/4500264.  That was the same watch that DAVIDOFF had helped MIT sell to the customer in Kazakhstan and then attempted to have returned and moneys paid refunded, once the watch was determined to be defective.

74.     That website was maliciously created, according to the website records and investigation, by DAVID, who essentially hijacked another person's identity, to create a defamatory website in DAVIDOFF's name.

75.     Likewise, the SHAMAYEVS, carrying out their threats to destroy DAVIDOFF and KALIMANTO by all possible means, started to post the same or similar messages and "alerts" on numerous websites in Germany.  Again, repeating the litany of their false accusations, they claimed as though DAVIDOFF had "stolen" that watch.  No details were provided in any of those defamatory messages, but those made it appear as though DAVIDOFF walked into MIT's store and allegedly "stole" that watch.  In fact, DAVIDOFF never even visited that store in New York.

76.     Acting with a unspeakable malice and ruse, the SHAMAYEVS also copied DAVIDOFF's pictures on certain websites and posted those together with the alerts brandishing his name as that of a thief who, according to their false claims, had stolen a watch from MIT.

77.     In a particular instance, the SHAMAYEVS also obtained from some sources an image of DAVIDOFF's passport as the citizen of Germany and posted DAVIDOFF's passport in an image on the defamatory webpages.

78.     All those defamatory postings by the SHAMAYEVS, attacking DAVIDOFF, were patently fraudulent and false, unspeakable and extreme in their offensiveness, brazen in their claims and in their use of the Internet capabilities, calculated to destroy the reputation of their target.

79.     As a result of that malicious defamatory campaign orchestrated and staged by the SHAMAYEVS, KALIMANTANO's business incurred very substantial damages. Its reputation in Germany was smeared, and numerous customers either avoided buying from KALIMANTANO, or curtailed their accounts.

80.     Likewise, DAVIDOFF's personal reputation was suddenly very seriously damaged.  Anyone making a simple search on the Internet on DAVIDOFF's name would see the numerous MIT's highly offensive postings on at least dozen web portals or websites, falsely calling DAVIDOFF 'a thief', who had allegedly 'stolen a watch', the Patek Philippe, 5970, presumably from the MIT store.

81.     In fact, such false allegations were made against the background that DAVIDOFF, again, never even visited MIT's store in New York and met with nobody from MIT other than once with MICHAEL in Frankfurt, when MICHAEL sold that watch to the foreign customers, obtaining cash.  In order to ascertain all the relevant circumstances, MICHAEL never made any allegations or made any statements to the German law enforcement neither in the course of his trip to Germany on January 4-5, 2012, where this would have been required, nor, on information and belief, at any other times to date.  Otherwise said, all those allegations against DAVIDOFF were entirely made up by the SHAMAYEVS.

82.     SHAMAYEVS were fully aware that their brazen and malicious accusations of DAVIDOFF that they caused being highly aggressively posted on the Internet, were patently false and a product of pure fabrication.

83.     That included DAVID, who, as evidence shows, personally created a defamatory website www.tofikdavidoff.com.

84.     The SHAMAYEVS' objective was to discourage DAVIDOFF and KALIMONTANO from pursuing the lawful means to recover from SHAMAYEVS the moneys actually paid, towit $120,000 and €135,000, and returning to them their defective watch Patek Philippe, fraudulently sold as new and certified item, which it was not.

## COUNT I. RACKETEERING INFLUENCED AND CORRUPT ORGANIZATION ACT

85.     Plaintiff incorporates by reference the allegations in Paragraphs 1 to 84 above, as if restated herewith with the same force and effect.

### (i) Pattern of Racketeering Activity

### (a) Mail and Wire Fraud

86.     As mentioned above, the RICO enterprise, as alleged above, comprising four individuals from the same family and their corporation, carried out its pattern of racketeering activity through over 10 instances of wire and mail fraud, as defined in 18 U.S.C. §§ 1341, 1343, between 2010 to date.  Wire and mail fraud comprise the predicate acts, or racketeering activity, pursuant to 18 U.S.C. §1961(1)(B).

87.     As mentioned above, the SHAMAYEVS used e-mails with false information, making fraudulent proposals sent to KALIMANTANO.  Later they used the telephone connection from the USA, making calls to Germany, in furtherance of their extortionist activities.  Mail fraud included particularly BORIS's writings by e-mails to

KALIMANTANO and DAVIDOFF, making the patently false statements and making threats, in furtherance of the fraudulent and extortionist tactics.

88.     18 U.S.C. §1961(5) defines a pattern of racketeering activity as two or more acts of racketeering activity within a ten year period.  The present enterprise's several instances over one year period exceeded by far the statutory minimum, including the wire and mail frauds for the purposes of racketeering.

**(b) Money Laundering, Receipt and Transportation of Stolen Property**

89.     The RICO enterprise alleged herein also engaged in several instances of money laundering, pursuant to 18 U.S.C. §§1956(a)(2), 1957, which also comprised the racketeering activity under 18 U.S.C. §1961(1)(B).

90.     These transactions constituted several instances of money laundering as a part of that enterprise's racketeering activity to exceed the minimum number of racketeering acts to comprise a pattern of racketeering activity as defined in 18 U.S.C. §1961(5).

91.     As mentioned above, on January 5, 2012, MICHAEL took the flight from Frankfurt to New York.   Given the subsequent false accusations against KALIMANTANO and DAVIDOFF, the reasonable presumption may be drawn that MICHAEL never reported that amount, €135,000 at the border entry point and customs check point in New York (federal Form 6059B).  That amount exceeded, almost 20 times, the statutory $10,000 that could be carried through the border point without being reported on the U.S. customs form in the answer to question #13.  It also exceeded, almost 40 times, the statutory minimum of $5,000.

92.     As cited above, on that same day, January 5, 2012, KALIMANTANO and DAVIDOFF wire transferred $70,000 and $50,000, in two separate wire transactions to

MIT's account at Bank of America, for prepaid advances made towards purchasing the ordered watches, in accordance with the invoice from MIT.  The wire transfers of these amounts contained the reference to those exact items.  See Exhibits A-C.

93.     On information and belief, Defendants converted the money received as a result of those two wire transfers, dispensing with that money, which activities also represented money laundering, covering up for the underlying predicate acts of fraud.

94.     Subject to leave of discovery and an opportunity to subpoena to Bank of America, to disclose MIT's account records at the relevant time in January of 2012, Plaintiffs will be able to show MIT's and SHAMAYEVS' transactions dispensing with the $120,000.  Plaintiffs allege herewith, given all the circumstances, represented money laundering, for purposes of dissipating the proceeds fraudulently obtained from KALIMANTANO.

95.     Defendants, acting in conspiracy, received money and further transferred, in several separate transactions, in excess of $5,000 each, knowing the same to have been stolen, unlawfully converted or taken, in violation of 18 U.S.C. §§1956 and 1957.

96.     Furthermore, each Defendant received money in excess of the statutory minimum of $5,000, knowing the same to have been stolen, unlawfully converted or taken, all also in violation of 18 U.S.C. §§2314, 2315.

### (c) Extortion.

97.     As mentioned above, on separate occasions and ultimately in the course of the telephonic call to Germany June 14-15, 2012 SHAMAYEV threatened to "contract" DAVIDOFF's murder, as well as to cause the physical harm to the members of DAVIDOFF's family, "crushing them", using menacing obscenities.

98.     Those and similar threats were made by MICHAEL and BORIS on several other occasions by telephone, again, to DAVIDOFF.

99.     At least one of the objectives pursued by the SHAMAYEVS was to extort from KALIMANTANO and DAVIDOFF a decision to abandon their lawful claims for the return of the moneys paid to the SHAMAYEVS and MIT.  They also extorted a decision from KALIMANTANO and DAVIDOFF to abandon their demand to return back to MIT the purchased watch 'Patek Philippe', which item turned out to be not new, uncertified and defective.

100.     KALIMANTANO and DAVIDOV thus became the victims of extortion, in conjunction with receiving the threats to order killing DAVIDOFF, as well as the threats to the safety of his family members, articulated on several occasions by the SHAMAYEVS.   As mentioned above, that message was most specifically and graphically spelled out by SHAMAYEV in his telephonic call to DAVIDOFF, in the night time on June 14 through June 15, 2012, in which he used vulgar profanities.

101.     Defendants' extortion from KALIMANTANO and DAVIDOFF, for purposes of forcing them to abandon the lawful claims was also a part of the racketeering conspiracy alleged herewith.

**(d) Threats of Violence and Retribution for Asserting Lawful Claims.**

102.     At the time SHAMAYEVS were making threats to DAVIDOFF, he had already indicated that he was going to file claims in the court in the U.S.  DAVIDOFF also made clear his intention to report the SHAMAYEVS' frauds to the law enforcement in the U.S. for initiating the criminal case.  By virtue of the complaints to be initiated in the U.S., DAVIDOFF should have been considered a witness in the forthcoming U.S.

proceedings.   Furthermore, DAVIDOFF made known that a similar criminal complaint was being already lodged with the law enforcement in Germany.

103.    Any threat involving murder, as shown herewith, comprises a predicate act under RICO, 18 U.S.C. §1961(1)(A), whereas the violations of 18 U.S.C. §§1512, 1513, and 1958 likewise comprise racketeering activity under 18 U.S.C. § 1961(1)(B), with the extra-territorial effect if interstate communications were used.   The applicable statute does not require the official proceeding to be already pending, it is sufficient to ("hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense").

**(d) Injury to Plaintiffs' Business or Property as a Result of Racketeering Activities.**

104.    As mentioned above, the pattern of the racketeering undertaken by Defendants, resulted in the loss of the $120,000 wire transferred to MIT's account at Bank of America, in two transactions, and €125,000 actually paid in cash to MICHAEL in Frankfurt, Germany.   As mentioned above, the ultimate customers in Kazakhstan returned the watch to a trustee in Germany, designating FELDE as the assignee for filing the claims for the full refund and for the return of the defective watch back to MIT.

105.    Altogether, the monetary loss to KALIMANTANO and/or DAVIDOFF from those transactions staged by MIT and the SHAMAYEVS amounted $120,000 plus $173,300 at the rate of the day for the conversion of Euros to dollars, the total of money paid being $293,300.

106.    Furthermore, the SHAMAYEVS' purposefully posting at least a dozen of patently offensive, brazen and false accusations and "alerts" against KALIMANTANO

and DAVIDOFF, in light of the damage to the ongoing successful wholesale business with foodstuffs, could be assessed at over $1 million.

107.    Plaintiffs are entitled to relief under said Count under RICO, with the statutory rights to the full extent allowed by the applicable federal law.

## COUNT 2.  CONVERSION.

108.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 107 above, as if restated herewith with the same force and effect.

109.    As the facts show, upon obtaining $120,000 on the account in the name of MIT on or about January 5, 2012, Defendants then converted the funds to their own use and benefit.   Defendants dishonored their obligation to return the advance for the merchandise that was not going to be sold and shipped to KALIMANTANO.

110.    As shown above, likewise, MICHAEL delivered the defective watch 'Patek Philippe', model 5970, knowing that it was not a new item, but a used and uncertified item produced in 2010.

111.    MICHAEL and other Defendants were fully aware also that this watch was not with the genuine original firm's seal of Patek Philippe in Geneva, Switzerland. MICHAEL concealed thus clarifying the question why there was no original seal, which triggered a reasonable presumption that it had been repaired, eventually with a market value of less than half of an original new, duly certified item.

112.    Defendants then refused to return the funds, €135,000 paid for that watch in cash in Frankfurt and to accept that watch back, as defective and without any certification or guarantee.

113.    As it turned out, MICHAEL's demanding cash and avoiding issuing a receipt for the cash he received was a part of a well calculated plot, in concert with the

other Defendants, to convert the funds in cash, using the reliance of the customers on MIT's representations and using Plaintiffs' inexperience of dealing with such outright frauds.

114.    By delivering the used item that was not what was agreed upon to be purchased, Defendants converted those funds in cash, €135,000, representing $173,300 at the rate of the day for Euros to dollars conversion, with the total of $293,300.

115.    Accordingly, Plaintiffs are entitled to relief under the count 'conversion', including the disgorgement of the converted $293,300, with interest and costs.

### COUNT III.  MONEY HAD AND RECEIVED

116.    Plaintiff incorporates by reference the allegations in Paragraphs 1 to 115 above, as if restated herewith with the same force and effect.

117.    Defendants obtained $120,000 on their account at Bank of America in the name of MIT, on January 5, 2012.  Thereupon, Defendants denied receiving that money and, on information and belief, used those funds for themselves, without any benefit to Plaintiffs.

118.    Likewise, MICHAEL demanded to obtain cash, for the amount of €135,000, representing $173,300 at the exchange rate of the day of the Euros into the dollars.  In this proceeding Plaintiffs also demand that Defendants accepted their defective watch Patek Philippe, 5970, currently held in trust in Germany, through FELDE, who is the designated trustee and assignee for purposes of asserting these claims, in exchange to the refund of the moneys paid.

119.    Thus, the total of the moneys had and received by Defendants amounted to $293,300.

120.    Accordingly, Plaintiffs are entitled to the disgorgement of about $293,300 by Defendants, with interest and costs.

## COUNT IV.  FRAUDULENT CONVEYANCES.

121.    Plaintiff incorporates by reference the allegations in Paragraph 1 to 120 above, as if restated herewith with the same force and effect.

122.    The transactions cited above, under Count I (RICO) are incorporated herewith by reference.  Those transactions also constituted fraudulent conveyances on that part of Defendants, which transactions should be undone, annulled and/or reversed.

123.    In particular, the transfers based upon the converted $293,300 should be judicially determined as annulled for purposes of returning the funds back to Plaintiffs, including FELDE as the assignee for bringing the claim for the funds paid in cash.

124.    The transactions undertaken by Defendants were fraudulent under the laws of several jurisdictions.

125.    Accordingly, Plaintiffs are entitled to relief of undoing fraudulent conveyances.

## COUNT V.  FRAUD.

126.    Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 125 above, as if restated herewith with the same force and effect.

127.    As the evidence shows, Defendants, making representations, or, alternatively, concealing the material facts, engaged in a fraudulent scheme, to obtain the funds from or through Plaintiffs.

128.    That included their representations to Plaintiffs from 2010 to June of 2012, made by e-mails and by telephone, in Germany.  Defendants made oral assurances and expressed their personal guarantees, both in the name of MIT and individually, as though

the watch 'Patek Philippe' 5970 was a genuine item, for which funds could be paid for to MIT's account.

129.   As it turned out, MIT's website, www.motionintime.com, was, however, one of the vehicles for perpetrating frauds.   Summarizing various defrauded customers' postings concerning MIT, on information and belief, that website, along with the promotional leaflets by circular e-mails advertised the watches' items that were uncertified, sometimes not new, and sometimes repaired.  The discounted prices were to lure the customers to inquire, but when the certification of the item was required, the item was somehow unavailable.

130.   That website in the name of MIT was operated by the SHAMAYEVS to target potential buyers outside of New York City.  As that website stated, the store on the 47th Street was already no more than a 'show room'.   The implication was that the advertised items were not necessarily available for sale on the spot.  DAVIDOFF and KALIMANTANO became victims of that promotional ruse, setting a trap for unsuspecting customers outside of New York.

131.   On information and belief, MICHAEL traveled to Germany only with the purpose of convincing Plaintiffs to pay money on the spot in cash, to make the money in cash unaccountable.  Except for the payment inevitably observed by the eye witnesses, MICHAEL left no written receipt proving he took that money.   MICHAEL further skillfully labored for obtaining the consent of the victims to wire transfer the money to MIT's account towards future purchases.

132.   MICHAEL's trip to Frankfurt further served and advanced the purpose of perpetrating that pre-planned conspiracy and frauds towards obtaining the funds for the items that were promoted but apparently unavailable at MIT.   Given all the

circumstances, Defendants, acting through MICHAEL, never intended to deliver the items to Germany, or at least they never intended to deliver new and certified watches, to Plaintiffs, at any time.

133.    That fraud with selling goods on false pretenses was highly sophisticated. It was undertaken by four individuals, all close relatives, acting in concert, using their company in New York, MIT, at their store's address used as a 'show room'.  That fraud, of promising a drastically discounted price as compared to the genuine item's prices, was originated in New York.   That scheme represented an ongoing conspiracy to lure unsuspecting customers, such as Plaintiffs, who became victims of such sophisticated fraud.

134.    As mentioned above, MICHAEL and other Defendants were under the obligation to disclose to Plaintiffs that the watch delivered by MICHAEL was not new and was defective and that there was no proper certification of Patek Philippe, a Geneva firm, for that item.

135.    When SHAMAYEVS used their website to promote their 'show room' in New York, it was also a part of the plot to defraud.   Likewise, when SHAMAYEVS made fraudulent representations to Plaintiffs, as well as the third parties, through the Internet, they knew that their statements and accusations were patently false.

136.    Accordingly, Plaintiffs are entitled to relief under the count 'fraud' asserted against Defendants.  Plaintiffs are entitled to punitive and exemplary penalties to the full extent allowed by the law, for Defendants' despicable fraud.

### COUNT VI.  MISREPRESENTATION

137.    Plaintiff incorporates by reference the allegations in Paragraphs 1 to 136 above, as if restated herewith with the same force and effect.

138.    Defendants made misrepresentations to Plaintiffs, while attempting to obtain the funds.   Particularly at the meetings in Frankfurt on January 4-5, 2012, MICHAEL articulated various misrepresentations as to the condition of the item he was selling.   In fact, if not Defendants' false pretenses, they would have not obtained those funds from or through Plaintiffs.   Except for MICHAEL's false pretenses, no cash amount of €135,000 would have been paid to him.

139.    In fact, Defendants never intended to repay to Plaintiffs for the defective item to be returned or to provide in the future any genuine merchandise to them, as ordered.   As mentioned above, those misrepresentations towards obtaining funds upfront, promising to provide the merchandise at a later time were fraudulent and a part of the plot to deceive.

140.    After Defendants had, on information and belief, already actually converted the funds, they continued the misrepresentations to Plaintiffs, vaguely promising to deliver the ordered watches for Plaintiffs, against the advance payment of $120,000 received by wire.   However, at no time did Defendants send back to Plaintiffs the formal confirmation of receiving the two wire transfers, which set the stage for the fraud of denying receiving those moneys.

141.    Defendants further concealed that most important information from Plaintiffs purposefully, knowing well that the watch delivered by MICHAEL was not new and it was defective, probably repaired and certainly not sellable as a genuine new watch, certified by Patek Philippe.

142.    Plaintiffs are entitled to damages under the count 'misrepresentation' asserted against the Defendants, including punitive or exemplary damages to the full extent allowed by the law.

## COUNT VII.  CIVIL CONSPIRACY

143.    Plaintiff incorporates by reference the allegations in Paragraphs 1 to 142 above, as if restated herewith with the same force and effect.

144.    As the facts show, from the outset Defendants conspired among themselves to obtain Plaintiffs' and third parties' funds in advance, using their entity MIT.  Defendants never intended to provide the legitimate merchandise to Plaintiffs, but intended to divide and spend those proceeds for their personal or unauthorized use.

145.    Although not completely avoiding contacts with Plaintiffs after January 5, 2012, Defendants nonetheless made those contacts increasingly difficult for DAVIDOFF. First they used those irregular contacts only to assuage DAVIDOFF's concerns against the growing appearance of the fraud committed on DAVIDOFF and KALIMANTANO, and to gain more time.

146.    When the demand was made for the refund for the funds for the watch 'Patek Philippe' 5970, to be returned back to MIT as defective, the tonality of the contacts immediately changed.  From that point on, Defendants launched a campaign to defame and intimidate Defendants by all possible means.

147.    SHAMAYEV, who was at the center of the conspiracy, and MICHAEL were the prime figures in the civil conspiracy to convert the funds and to engage in extortion, making the threats to the personal safety of DAVIDOFF and of his family.  As cited above, those threats culminated when SHAMAYEV fully articulated, with the obscenities, those threats, including the threat to contract DAVIDOFF's murder, as made in the course of his nighttime call to DAVIDOFF in Germany from June 14 to June 15, 2012.

148.     Defendants received the total of about $293,300, for the merchandise, that was either never delivered or represented by the defective watch item 'Patek Philippe', that was not certified, apparently used, most likely repaired, and in that condition without certification had less than half the market value.

149.     It was also a part of the conspiracy that Defendants organized the campaign of extortion from Plaintiffs, with the purpose of coercing them into abandoning their lawful pursuit of collecting the debt, including through complaints to be lodged with the law enforcement both in Germany and in the U.S.

150.     Plaintiff is entitled to damages under the count 'civil conspiracy'.

### COUNT VIII.  UNJUST ENRICHMENT.

151.     Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 150 above, as if restated herewith with the same force and effect.

152.     As shown above, on January 5, 2012, Defendants obtained about $293,300 and then converted those amounts to their own personal use, without any regard to the orders placed by Plaintiffs.   That included KALIMANTANO's and DAVIDOFF's reliance on two offers and preliminary invoices prepared by MIT.

153.     By way of obtaining those proceeds and using those for their personal or unauthorized needs, Defendants were unjustly enriched.  That included the above cited amount, except for the value of the defective watch that Plaintiffs unsuccessfully attempted to return to MIT.  The notation is made that said watch had eventually less than half of the value of a new item.  In any event it was not the item that the customers desired, who required only a brand new item with the certification, and they were entitled to return it for the full refund.

154.     Accordingly, Plaintiff is entitled to damages for 'unjust enrichment'.

## COUNT IX.  DEFAMATION.

155.    Plaintiff incorporates by reference the allegations in Paragraphs 1 to 154 above, as if restated herewith with the same force and effect.

156.    Shortly after Plaintiffs first claimed the proceeds to be refunded back to Plaintiffs and the watch Patek Philippe, 5970 be returned, Defendants launched the defamation campaign against KALIMANTANO and DAVIDOFF and made clear that Plaintiffs would make them regret dearly if they would pursue those claims.

157.    In fact, Defendants carried out their threats, making the increasingly offensive statements concerning DAVIDOFF and KALIMANTANO to third parties, both orally by telephone and in writing, whereby using the highly offensive and false statements on the Internet.

158.    In particular, Defendants circulated and published using the Internet for the attention of third parties the false accusations against DAVIDOFF and KALIMANTANO, as though KALIMANTANO's president DAVIDOFF was a 'thief', fraud, dishonest, and unreliable for the counterparts.

159.    After KALIMANTANO and DAVIDOFF lodged a criminal complaint against the perpetrators before the Attorney General's Office for Hessen Province in Germany, Defendants drastically intensified their complaint for the purpose of defaming Plaintiffs and retaliating for Plaintiffs' seeking the protection of the law enforcement.

160.    Among other lines of attacks, SHAMAYEVS attributed to DAVIDOFF and KALIMANTANO the falsity as though they were liable to Defendants for the alleged 'stealing' the watch 'Patek Philippe', 5970.

161.    In fact, that watch was delivered by MICHAEL to Frankfurt, who received

for it the money in cash, €135,000.  MICHAEL never complained to German authorities

of any 'theft', nor called police which would have been required for such claims and

allegations in Germany.

162.    Later, when Plaintiffs demanded to return the watch back to MIT and to

get the refunds, Defendants made up the patently false story of a 'theft'.  Defendants

fraudulently used the fact that MICHAEL did not leave behind any receipt for the cash he

counted and obtained in the Hilton hotel in Frankfurt, before four witnesses of his

counting.

163.    At the same time, Defendants avoided to pursue his alleged claims in any

court of law, engaging only in fabricating and propagating the malicious allegations

against KALIMANTANO and DAVIDOFF.

164.    In fact, Defendants' statements in the Internet, including setting up a

fraudulent website: www.tofikdavidoff.com, essentially operated to hijack someone's

identify for making patently untrue statements.  Defendants pursued their agenda to

defame Plaintiffs, depriving them of their good faith reputation and discouraging their

clients and customers from dealing with KALIMANTANO and DAVIDOFF.

165.    As mentioned above, DAVID was instrumental in creating a defamatory

website in the name of DAVIDOFF, essentially engaging in the Internet piracy and

defamation for the extortionist purposes of all Defendants.

166.    That malicious campaign by Defendants had in fact a very negative effect

on KALIMANTANO's and DAVIDOFF's business, which was very much dependent

upon their public image and reputation.

167.    Plaintiffs are entitled to relief under the count 'defamation'.

**COUNT X.  DAMAGE TO BUSINESS REPUTATION.**

168.    Plaintiff incorporates by reference the allegations in Paragraphs 1 to 167.

169.    As the facts above show, Defendants made a number of written statements, attacking KALIMANTANO and DAVIDOFF, smearing them through the use of the Internet, formulating the accusations that they knew were patently invented and false.

170.    As cited above, Defendants accused KALIMANTANO and DAVIDOFF as though they were dishonest, that DAVIDOFF allegedly 'stole' the certain watch, which MICHAEL actually sold to KALIMANTANO's customers and received the payment in cash for that.  FELDE, as a part of KALIMANTANO's team, was also damaged.

171.    While launching a plethora of malicious and false accusations against DAVIDOFF and KALIMANTANO, at the same time Defendants avoided going into any court of law in order to actually adjudicate any of their allegations.

172.    The true purpose of such vicious and malicious attacks on the part of Defendants was to defame KALIMANTANO and DAVIDOFF and to damage their business reputation, both for deterring Plaintiffs from prosecuting the claims for money and discouraging them from bringing and pursuing those lawful claims in the court of law.

173.    The damage to Plaintiffs' reputation, given the turnover of their business in Germany, and the effect of diverting their customers and counterparts, could be assessed at over $1 million.

174.    Plaintiffs are entitled to relief under the count of damage to business reputation.

## COUNT XI.  DECLARATORY JUDGMENT.

175.   Plaintiff incorporates by reference the allegations in Paragraphs 1 to 174 above, as if restated herewith with the same force and effect.

176.   As the facts above show, Defendants undertook a malicious campaign of defaming DAVIDOFF and KALIMANTANO, in particular accusing DAVIDOFF as though he had 'stolen' the watch in question, Patek Philippe, 5970.

177.   Given the uncontrollable and deliberately aggressive campaign of Defendants to smear the reputation of DAVIDOFF and of KALIMANTANO, Plaintiffs were left with no choice, but to seek the relief of the Court to make a declaratory judgment establishing that DAVIDOFF and KALIMANTANO never 'stole' a watch from Defendants, or anything at all from Defendants.

178.   On the contrary, the declaratory judgment sought herewith should rather establish that it was Defendants who actually engaged in conversion and grand larceny and subsequently published false accusations with ulterior motives.

179.   Seeking such relief is particularly warranted in light that of the fact that Defendants deliberately avoided filing any such defamatory claims in any court of law. Thus, Defendants disallowed scrutinizing such allegations in a judicial proceeding with the subsequent judicial determinations.

180.   Specifically, to Plaintiffs' knowledge, Defendants have declined going into any court in Germany and, likewise, declined going into court in the USA.  Instead, they only engaged in malicious defamation and fabrications, acting like Internet pirates, assuming another person's identity to create a special defamatory website www.tofikdavidoff.com.

181.   Consequently, this matter represents the only opportunity and judicial forum for Plaintiffs to redeem their reputation, clear their reputation off the malicious lies propagated and published by Defendants.

182.   Plaintiffs are entitled to relief under the count 'declaratory judgment'.

## COUNT XI.  INJUNCTIVE RELIEF.

183.   Plaintiffs incorporate by reference the allegations in Paragraphs 1 to 182 above, as if restated herewith with the same force and effect.

184.   As shown above, the SHAMAYEVS engaged in posting on the Internet various fraudulent attacks on DAVIDOFF and KALIMANTANO, claiming as though DAVIDOFF had 'stolen' their watch 'Patek Philippe', 5970.

185.   As mentioned above, this was an outright lie.  DAVIDOFF never visited MIT's store in New York.  When MICHAEL visited Frankfurt, requiring upfront the full refund of the air tickets from New York, he brought with him to the watch in question. MICHAEL sold that item for cash, in the amount of €135,000, which he counted in his hotel room No. 426, Hilton Hotel in Frankfurt, in the presence of four (4) witnesses.

186.   Defendants should be ordered to immediately stop making their false, malicious and virulently fraudulent attacks on DAVIDOFF and KALIMANTANO.  They should also be ordered to withdraw or deactivate all their postings on the Internet that they undertook after June 15, 2012.

187.   Defendants should also be ordered to delete the defamatory website www.tofikdavidoff.com, created for extortionist purposes, intimidation and for causing ongoing damage to the reputation of Plaintiffs, and be prohibited from such conduct concerning DAVIDOFF and KALIMANTANO in the future.

188.   Plaintiffs are entitled to relief under the count of injunctive relief.

## PRAYERS FOR RELIEF

THEREFORE, Plaintiff requests this honorable Court to grant relief as follows:

1)      To order all Defendants to refund, jointly and severally, about $293,300, the money they received through MICHAEL and directly through two separate wire transfers on their account at Bank of America, with the statutory interest accrued since January 5, 2012, until such time when they return those funds in full;

2)      As a part of the settling the refund, Defendants should be ordered to accept their watch 'Patek Philippe', 5970, that they sold for €135,000 as a brand new and certified watch, with the guarantee from MIT; whereas the item turned out to be used, produced in 2010, without the original seal, with the market value of such a watch being less than half of what was paid.

3)      To order Defendants to pay, jointly and severally, all other damages under each and every Count above;

4)      To treble the damages pursuant to 18 U.S.C. §1964(c) in accordance with the applicable statutory law;

5)      To award other or alternative punitive and/or exemplary damages against Defendants, for their intentional misrepresentations and for obtaining funds from Plaintiffs on false pretenses and for converting those proceeds to their personal use, to the full extent allowed by the applicable law;

6)      To issue a declaratory judgment that Plaintiffs never 'stole' anything from Defendants, including the determinations that DAVIDOFF never visited MIT's store and that MICHAEL sold the watch in question in Frankfurt for cash, never making any claims in Germany to German authorities;

7)     To declare that Defendants are jointly and severally liable on the claims in this action;

8)     To award special and punitive damages against Defendants for defamation with malice, particularly for the damage to the business reputation of KALIMANTANO and DAVIDOFF;

9)     To award attorneys' fees and costs;

10)    To grant such other and further relief as the Court deems proper.

Respectfully submitted:

Dated: September 12, 2012


/s/_____
PETER A. JOSEPH, Esq.
Bar PJ-9723
177 Waverly Place # 5F
New York, NY, 10014-3552
Tel. (212) 924 1498
E-mail: peter.joseph72@post.harvard.edu


/s/_____
GEORGE LAMBERT, Esq. (D.C. Bar No.
979327), subject to admission pro hac vice
LAW OFFICES OF LEONARD SUCHANEK
1025 Connecticut Avenue, #1000, NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (202) 747 7797
E-mail: lawdc10@aol.com

Attorneys for Plaintiffs

## DEMAND OF JURY TRIAL.

Plaintiffs demand jury trial in this action.

Respectfully submitted.

Done on September 12, 2012.


/s/_____
PETER A. JOSEPH, Esq.
Bar PJ-9723
177 Waverly Place # 5F
New York, NY, 10014-3552
Tel. (212) 924 1498
E-mail: peter.joseph72@post.harvard.edu



/s/_____
GEORGE LAMBERT, Esq. (D.C. Bar No.
979327), subject to admission pro hac vice
LAW OFFICES OF LEONARD SUCHANEK
1025 Connecticut Avenue, #1000, NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (202) 747 7797
E-mail: lawdc10@aol.com


Attorneys for Plaintiffs