UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

KALIMANTANO GmbH;
(a company under the laws of Germany)
TOFIK DAVIDOFF;
KONSTANTIN FELDE;                              CIVIL No. 12cv6969 (PAE)
JOHANNES SCHWEGLER
(all three German citizens)

    Plaintiffs

-against-

MOTION IN TIME, INC.
(a New York corporation);
EDDIE SHAMAYEV, d/b/a EDDIE
JEWELRY, INC.; d/b/a AMRUS
JEWELRY, INC.;
MICHAEL SHAMAYEV;
BORIS SHAMAYEV;
DAVID SHAMAYEV
(all four residents of New York State)

and DOES from 1 to 100

    Defendants

**PLAINTIFFS' MEMORANDUM
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
AMENDED COMPLAINT**

## TABLE OF CONTENTS

Introduction………………………………………………………………...…………1

1.     Apparent Defects of Motion to Dismiss………………………………………….....3

2.     Standard of Review for Motions to Dismiss in General……………………….....5

3.     Argument that Konstantin Felde and Johannes Schwegler "Must Be
     Dismissed as Plaintiffs" Has No Merit………………………………………….6

4.     All Elements Necessary for Pleading Civil RICO Are Thoroughly
     Stated in Amended Complaint………………………………………………….....7

5.     Defendants' Attack on State-Law Claims Is Generally without Merit…………..…....16

6.     Breach of Contract Count Was Adequately Pled……………………………….....17

7.     Count under Claim for Conversion Was Adequately Pled……………………….....18

8.     Count Based on Money Had and Received Was Even not Challenged
     by Defendants………………………………………………………………….....19

9.     Count for Fraudulent Conveyances Was Adequately Pled……………………….....20

10.    Counts for Fraud and Misrepresentation Were Adequately Pled………………….....21

11.    Count under Civil Conspiracy Was Adequately Pled………………………….....21

12.    Count under Claim for Unjust Enrichment Was Adequately Pled……………….....22

13.    Count under Claim for Defamation Was Adequately Pled………………………….....23

14.    Count under Tortious Interference with Business Relations
     Was Adequately Pled……………………………………………………………….....23

15.    Count for Injunctive Relief Was Adequately Pled………………………….....24

Conclusion………………………………………………………………………….....25

# LIST OF AUTHORITIES

| CASES | |
|---|---:|
| Aaron v. Mattikow,<br>    2004, 225 F.R.D. 407. | 21 |
| Adams v. Lindblad Travel, Inc.,<br>    730 F.2d 89, 94 (2d Cir.1984). | 19 |
| Amin Realty v. K & R Constr. Corp.,<br>    306 A.D.2d 230, 231, 762 N.Y.S.2d 92 | 17 |
| Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas,<br>    727 F.Supp.2d 256, S.D.N.Y.,2010. | 18 |
| Ashcroft v. Iqbal,<br>    556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) | 5 |
| Atlas Air, Inc. v. General Elec. Co.,<br>    16 A.D.3d 444, 791 N.Y.S.2d 620, N.Y.A.D. 2 Dept.,2005 | 17 |
| Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,<br>    268 F.3d 103, 107 (2d Cir.2001),<br>    cert. denied, 537 U.S. 1000, 123 S.Ct. 513 (2002) | 8 |
| Bankers Trust Co. v. Rhoades,<br>    859 F.2d at 1102 | 8 |
| Bell Atlantic Corp. v. Twombly,<br>    550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) | 5 |
| Eberhard v. Marcu,<br>    C.A.2 (N.Y.)2008, 530 F.3d 122 | 21 |
| Feinberg v. Katz,<br>    2002 WL 1751135, (S.D.N.Y. Jul 26, 2002) | 7 |

| | |
|---|---|
| Lerman v. Joyce Intern., Inc.,<br>    10 F.3d 106, C.A.3 (N.J.),1993 | 7 |
| NYKCool A.B. v. Pacific Intern. Services, Inc.<br>    Slip Copy, 2012 WL 5462611, S.D.N.Y. | 7, 8 |
| U.S. v. Amor,<br>    C.A.2 (N.Y.) 1994, 24 F.3d 432 | 13, 14 |
| U.S. v. Paredes,<br>    950 F.Supp. 584, S.D.N.Y.,1996 | 12 |
| United States v. Sasso,<br>    215 F.3d 283, 289–90 (2d Cir.2000) | 8 |

## STATUTES

| | |
|---|---|
| 18 U.S.C. § 1341 | 9 |
| 18 U.S.C. § 1343 | 9 |
| 18 U.S.C. § 1512 | 10 |
| 18 U.S.C. § 1513 | 10 |
| 18 U.S.C. § 1958 | 10, 12 |
| 18 U.S.C. § 1961 | 9, 10 |
| 18 U.S.C. § 1962 | 8, 14 |
| 18 U.S.C. § 2314 | 10 |
| 18 U.S.C. § 2315 | 10 |

**Introduction.**

This case was filed on September 14, 2012.  The Complaint, brought by a German company, Kalimantano GmbH ("Kalimantano"), and its managers, cited several prior cases in different courts in New York, concerning Defendant Motion in Time, Inc. ("MIT") and/or their corporate predecessors or principals, namely Eddie Shamayev, Michael Shamayev, Boris Shamayev and David Shamayev ("Shamayevs").  See the Complaint at Para 7, citing the cases brought by Bvlova Corp., United Diamonds Corp., et al.

It is symptomatic that after this Complaint was already pending, on November 9, 2012, Cartier International AG et al. brought yet another lawsuit against MIT in this Court, Docket 12cv8216, assigned to The Hon. Furman.  Basically, all those actions portray a family group of four individuals, Shamayevs, acting as Amrus Jewelry, Inc. (dissolved), now known as MIT, located on the 47th Street in the Diamond District in Manhattan.  What transpired in those cases is that the same Defendants allegedly engaged in systematic defrauding those who had a misfortune to deal with them.  The plaintiffs in the other cases invariably complain that MIT and Shamayevs who do not have any distribution license from any watch producers, engage in obtaining used or repaired luxury watches, which they then refurbish, polish and resell those as though those were licensed new luxury watches' items, amassing in the process an enormous fraudulent income.

As submitted under the Request to Take Judicial Notice, filed separately, it will be appropriate for this Court to notice the Complaint in the parallel case, Docket 12cv8216, which is now pending in this Court, since November.  Moreover, the same Defendants had engaged in the same fraudulent conduct for years, see Docket 05cv9976, that was in this Court before The Hon. Swain.  That other action was reduced to a consent judgment against MIT (among other

1

defendants) on June 8, 2010.  Yet, the same producer, Cartier, has had to file yet a new case against MIT.

What makes this particular lawsuit against MIT and Shamayevs drastically different is that the Shamayevs engaged in the racketeering conduct, that included their threats to have Plaintiff Tofik Davidoff ("Davidoff") killed by way of contracting his murder, referring to the threats articulated by Eddie Shamayev.  That included the threats to Davidoff's family to be physically harmed, unless Davidoff gave up and declined to bring the action in the court of law, as expected.

Plaintiffs are fully aware that this Court is bound to consider only what is in the Complaint or in the Amended Complaint, in the record of the docket.  Yet, Plaintiffs believe that one particular issue occurring after the initial Complaint was filed on, as a matter of an exception, needs to be brought to the attention of this Court.

Only days after the Complaint was filed on September 14, 2012, Plaintiff Davidoff was receiving phone calls from several individuals, believed to be the certain criminal "authority" figures.  Some of those calls were traced to Ukraine.  Those unannounced callers, claiming to have connections and means in the underworld, introduced themselves as calling on behalf of Shamayevs.  Those individuals, using the racketeering jargon, demanded from Davidoff and Kalimantano to immediately withdraw the Complaint filed in this Court, or alternatively to carry out what Eddie Shamayev had promised, i.e. to contract a killer and to take Davidoff out.  The attempts to investigate the sources of such calls show so far that those came from the suspected criminal figures, apparently acting on the directive of Shamayevs.  The Davidoff family fears for the life of the head of the family, as well as for the safety of the family members.

Plaintiffs are fully aware that the directive of this Court in the Order dated October 22, 2012 allowed them only to amend the Complaint, not to supplement it.  Therefore Plaintiffs had no right to supplement Complaint under F.R.Civ.P. 15(d) at this time.

Given the extraordinary circumstances when Plaintiffs have to fear for the life of Kalimantano's principal Davidoff, in light of the new threats coming from the apparent criminal figures, Plaintiffs will thus seek leave from this honorable Court to supplement their Amended Complaint, at the first procedural opportunity.

**1.      Apparent Defects of Motion to Dismiss.**

There are several defects in Defendants' presenting their Memorandum, which is supposed to address the Amended Complaint and normally is expected to quote from it, addressing what is exactly pled by Plaintiffs.

First, Defendants' MTD consistently avoids quoting from the Amended Complaint.  Only meager portions of the sentences were quoted, such as "the RICO enterprise… comprising four individuals from the same family and their corporation…"; "the center and ad hoc hub for the racketeering activities by the enterprise…"; "the activities of the SHAMEYEVS (sic) were distinct from the racketeering enterprise, that merged with MIT".  See MTD, at p. 13, quoting from Para 111 and 132 of the Amended Complaint.  Such hoodwinking by Defendants what was actually pled and instead engaging in generalizations is insufficient on its face and improper.

Thus, instead of following the pleading, the MTD Memorandum is essentially "retelling" its own version, what the Amended Complaint about, declining to quote from it.  The result is that this allowed Defendants to distort and misstate what is actually pled in the Amended Complaint.  Consequently, Plaintiffs have no choice but to revert, by necessity, in many instances, to the quotations in the Amended Complaint.

Second, Defendants' MTD Memorandum is improper in that Defendants demand from the Court that it "must" rule this or that way.  For example, Defendants impose on this Court, in capital bold letters, that "KONSTANTIN FELDE AND JOHANNES SCHWEGLER MUST BE DISMISSED AS PLAINTIFFS" (subtitle, p. 5).  Defendants demand from the Court that: "both Felde and Schwegler lack standing to sue and must be dismissed as plaintiffs in this matter" (p. 6).  In another instance, Defendants demand, again, in capital bold letters: "PLAINTIFFS' RICO CLAIM MUST FAIL", stating: "This claim must be dismissed…" (p. 6); and again: "the RICO count must be dismissed" (p. 7); and yet time again: "the RICO cause of action must be dismissed" (p. 11).

Addressing the tort claims, Defendants, again, demand: "Although they must be dismissed for other reasons, Plaintiffs' tort claims…" (ft. 6, p. 14).   In another instance, Defendants demand: "Counts 3 through 9 and 11 must be dismissed" (p. 15).   Yet, again, Defendants demand: "Count II thus clearly does not state a claim upon which relief may be granted, and must be dismissed." (p. 15).   Then, again, stating a demand to the Court, Defendants state: "As such those claims must be dismissed." (p. 15).

This list of the quotations of the improper statements by Defendants, what this Court must do, goes on and on, throughout the MTD Memorandum[1].   On their part, Plaintiffs strongly object to that approach by Defendants, literally making demands on the Court what is must do. Generally, using the language "must" addressing the Court is improper, as it implies a sense of lack of respect to the decorum of the Court.   It should be almost never used in submissions before the Court, with probably only exceedingly rare exceptions when a court has no jurisdiction, which can be shown in a clear and unequivocal manner.   Here, as opposed,

---

[1] The computerized search count shows that "must" is used in Defendants' Memorandum 39 times, with the disclaimer that a portion thereof belongs to the case citations.

Defendants simply argue various points where they should not take a commanding tonality in the language addressed to the U.S. District Court.

Third, Defendants' Memorandum is saturated with the citations from the case law, which are, however, disconnected from the pleading.  Time and again, Defendants fail to connect the case law they cite with actually the allegations and the exact statements in the Amended Complaint.  In Plaintiffs' estimate, about half of the narrative on the law in Defendants' Memorandum is simply disconnected from any paragraphs in the Amended Complaint.

### 2.     Standard of Review for Motions to Dismiss in General.

Plaintiffs do not disagree with Defendants as to the standard established by the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, but Defendants missed a few important quotations from that holding.  In order to survive a motion to dismiss, a complaint "does not need detailed factual allegations" but must provide allegations sufficient "to raise a right to relief above the speculative level." 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The complaint must therefore "plead[ ] factual content" that, when accepted as true, "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Plaintiffs, however, obviously disagree with the suggestions in Defendants' Memorandum, as though the Amended Complaint did not meet that relatively liberal threshold. Plaintiffs disagree with Defendants' submitting as though the pleading is "replete with conclusory allegations and does not state a plausible claim for relief" (MTD Memo, at p. 5).

On the contrary, Plaintiffs submit that the Amended Complaint is very detailed, precise on the facts and provides all the necessary information, required from a pleading.  It has all the relevant dates, sometimes pinpointing even to the time (for example, the phone call from Eddie

Shamayev to Davidoff in Germany, threatening to contract his murder and to harm his family). To demonstrate precision, the pleading states exactly how much money Shamayevs took ("This is an action to collect $120,000 and €135,000…Defendants instead engaged in making, as a part of the racketeering conduct, with open-ended continuity", see the Introduction to the Amended Complaint).

### 3.    Argument that Konstantin Felde and Johannes Schwegler "Must Be Dismissed as Plaintiffs" Has No Merit.

Defendants are mistaken believing that RICO claims may not be assigned, as so alleged in the Amended Complaint.  See MTD Memo, at p. 6.  The Complaint pleads that both are assignees of the chose of action.  Namely: "FELDE has been the assignee of the ultimate customers for the claims asserted in this action of the victims of the transaction", relating to the Philippe Patek watch.  See Para. 3.  As to the other Plaintiff, "SCHWEGLER is the assignee of the claims of the victims associated with the purchase from Defendants of the watch Blancpain, for $65,000", See Para 4.

Defendants, although, believe that: "These allegations, even if true, do not confer Felde or Schwegler with standing to sue Defendants."  Defendants further argue that: "It is clear from the language of the RICO statute itself that a person only has a standing to sue if he has been injured by he alleged RICO violation".  See MTD Memo, pp. 5-6.

However, the case law has established just the contrary to what Defendants believe.  In the landmark case on that particular issue, *Lerman v. Joyce Intern., Inc.,* 10 F.3d 106, C.A.3 (N.J.),1993, the Third Circuit issued the opinion, penned by justice Alito, before he became the justice of the U.S. Supreme Court.  Considering the same argument as Defendants interposed in their Memorandum, the Third Circuit reached the conclusion: "In sum, we hold that Joyce was not barred from recovering on the RICO claims assigned to it under the purchase agreement."

*Lerman*, *113.  In this Court, this authority was discussed, with approval, in *Feinberg v. Katz*, 2002 WL 1751135, *5 (S.D.N.Y. Jul 26, 2002)

Therefore, it is clear that both Felde and Schwengler, as the assignees, have standing to assert the claims, both under the RICO Count and under the tort Counts in the Amended Complaint.  There is no basis for dismissing them as plaintiffs.

In any event, F.R.Civ.P. 17 provides that it is improper just to dismiss a plaintiff on the basis of standing outright, towit: "(3) The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest."

Defendants' demand from this Court that both assignees, Felde and Schwegler, "must be dismissed" is misplaced.  Notably, no discovery has been initiated in this case, and Defendants lack any substantive arguments or the facts as to why an assignee of a chose of action may be dismissed, without proving, for example, invalidity of the alleged assignment.  Here, Defendants' attacks on the standing of two plaintiffs are simply preposterous at the pleading stage.

**4.    All Elements Necessary for Pleading Civil RICO Are Thoroughly Stated in Amended Complaint.**

The most updated recitation of the standards applicable to motions to dismiss RICO causes of action, of which Plaintiffs are aware, can be found in *NYKCool A.B. v. Pacific Intern. Services, Inc*. Slip Copy, 2012 WL 5462611, S.D.N.Y. (November 9, 2012). "RICO is a broadly worded statute" that "should be read broadly in light of Congress' self-consciously expansive language and overall approach in crafting RICO and Congress's express admonition that RICO is

to be liberally construed to effectuate its remedial purposes."  The court cited *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 107 (2d Cir.2001), cert. denied, 537 U.S. 1000, 123 S.Ct. 513 (2002); *United States v. Sasso*, 215 F.3d 283, 289–90 (2d Cir.2000)… Pursuant to 18 U.S.C. § 1962, "a person commits a RICO violation when he (a) invests income derived from a 'pattern of racketeering' in an 'enterprise'; or (b) controls an 'enterprise' through a 'pattern of racketeering activity'; or (c) participates in an 'enterprise' through a 'pattern of racketeering activity'; or (d) conspires to violate subsection (a), (b) or (c)." *Bankers Trust Co. v. Rhoades*, 859 F.2d at 1102 (citing 18 U.S.C. § 1962(a)-(d)).

That case law imposes on a plaintiff the burden to allege seven elements for pleading RICO: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce."  Ibid, *NYKCool*. *5.

The Amended Complaint fully alleges all seven elements for pleading RICO, which are enumerated one by one herein below.

(1) Defendants.

The Amended Complaint states the claim against 5 Defendants, out of which one is a New York corporation (MIT) and four, Shamayevs, are the family members running it.  See Para 5-11.

(2) Commission of Two or More Acts.

The Amended Complaint shows that these Defendants committed over 20 predicate acts falling within the prohibitions of RICO.

Plaintiffs pled the predicate acts under wire and mail fraud, towit: "111….(Defendants) carried out its pattern of racketeering activity through over 10 instances of wire and mail fraud, as defined in 18 U.S.C. §§ 1341, 1343, for several years to date."   The Amended Complaint shows that Defendants used e-mails, sent via international commerce channels, with false information, making fraudulent proposals sent to Plaintiffs in Germany, and ultimately threatening to kill, in an extraordinary extortion.   Likewise, Defendants used the telephone connection from the USA, making calls to Germany, in furtherance of their extortionist activities.

Plaintiffs also pled the predicate acts comprising money laundering, receipt and transportation of stolen property, e.g.: "114. The RICO enterprise, with an open-ended continuity, alleged herein, also engaged in several instances of money laundering, pursuant to 18 U.S.C. §§1956(a)(2), 1957, which also comprised the racketeering activity under 18 U.S.C. §1961(1)(B)."

In a particular instance, the Amended Complaint cites two wire transfers to MIT's account in New York as follows:

"117… on that same day, January 5, 2012, KALIMANTANO and DAVIDOFF wire transferred $70,000 and $50,000, in two separate wire transactions to MIT's account at Bank of America, for prepaid advances made towards purchasing the ordered watches, in accordance with the invoice from MIT.  The wire transfers of these amounts contained the reference to those exact items."

However, as shown by Plaintiffs, Defendants denied, among other instances, receiving that money, $120,000, consequently using it for purposes contrary to the terms of the advance prepayment wired from Germany.  Otherwise said, that amount was stolen by Defendants in New York.  Hence, these two transactions amounted to the predicate acts of receiving stolen property and subsequent dispensing with these funds amounted to money laundering activities in

New York.  The disclaimer is made that no discovery has been initiated so far.  Hence Plaintiffs have not been entitled to subpoena Bank of America to conclusively prove these allegations relating to money laundering.  Plaintiffs proffer the result of such a subpoena to the bank: each Defendant, with the full knowledge what they were doing, received money in excess of the statutory minimum of $5,000, stolen, unlawfully converted or taken, in violation of 18 U.S.C. §§2314, 2315.

The Amended Complaint also shows that Defendants engaged in the threats of causing physical harm, including to contract murder of Davidoff.  For example, Plaintiffs pled:

"122.  As mentioned above, on separate occasions and ultimately in the course of the telephonic call to Germany June 14-15, 2012 SHAMAYEV threatened to "contract" DAVIDOFF's murder, as well as to cause the physical harm to the members of DAVIDOFF's family, "crushing them", using the most menacing obscenities, with the racketeering jargon."

The Amended Complaint could not be clearer pointing to the applicable law:

"128.  Any threat involving murder, directed against DAVIDOFF, as shown herewith, comprises a predicate act under RICO, 18 U.S.C. §1961(1)(A).  The attempted murder and causing physical harm, the violations of 18 U.S.C. §§1512, 1513, and 1958 likewise comprise racketeering activity under 18 U.S.C. §1961(1)(B)…"

To sum up, the Amended Complaint cited altogether more than 20 distinct predicate acts falling within the prohibitions of at least 5 separate statutes that are part of the RICO legislation, Chapter 95 of Title 18 of the U.S. Code.

      <u>(3-4) Constituting a Pattern of Racketeering Activities Test</u>.

Defendants' Memorandum focused their attack on the RICO cause of action on the test of the "pattern" of racketeering activities.   Defendants dispense a substantial effort to argue as though "there is no closed-ended pattern here" and "there is no open ended pattern here" (pp. 7-11).  However, Defendants ignore the allegations in the Amended Complaint.

With regard to Defendants argument as though there is "no closed-ended pattern", this misstates the Complaint, that clearly shows the pattern, starting from 2009, when the first installment of $400,000 became illegally withheld by Defendants.  The facts in the Amended Complaint relate back to the first predicate acts as early as in 2009, towit:

"27.   In about 2009, a prominent business person from Almaty, Kazakhstan, engaged, Zori Borisovich Kushnir ("Kushnir"), principal of Perfection ZAO in Almaty, Kazakhstan, undertook the attempted business with MIT.  Kushnir was involved, among other lines of businesses, in the sales of watches in Kazakhstan and Russia.  After several transactions, MIT, claiming that the order required finding the items, required Kushnir to wire transfer to MIT's account a deposit of $400,000."

Thus, the first factual situations occurred more than 3 years ago, which is far more than two years, needed to state the 'closed-end' pattern.  Defendants are also incorrect when they imply that the RICO cause of action must be based on one conspiracy.  There is no prohibition to show several conspiracies, in which the conspirators, the members of the racketeering enterprise, targeted different victims, including the assignors of the claims.  That is the case here.

As shown above, those claims, relating to 2009 and later, were assigned to Plaintiff Schwengler.  Markedly, there was a connection to the same country, Kazakhstan, where the luxury watches items were supposed to be delivered to the ultimate customers.  In the process, however, Plaintiffs became the victims of the racketeering activities undertaken by Plaintiffs from New York, as described with great detail.

Defendants' approach as though this is only a "business deal gone sour" (p. 10) is pathetic.  Defendants carefully avoid even addressing that they threatened to contract murder of Davidoff, Kalimantano's principal.  Defendants' Memorandum on its 21 pages fails to mention, even once, the allegations that they threatened to contract Davidoff's murder.  In their mind, contracting murders apparently is just a natural part of a business "going sour".  Only in footnote

4 (p. 10), Defendants mentioned "Plaintiffs' several comments that Defendants' statements threatened harm in the future…"

Defendants essentially imply that since Davidoff was not actually killed (so far), thus threats "of violence", as they put it, did not constitute a predicate act.  This approach is plainly incorrect.  RICO was never designed the way that one needs to be killed and only then the victim's estate may sue under RICO.  That was obviously not Congress's intent when it passed Section 1958, to be triggered only when someone was killed, as this would be obviously too late.

In a criminal law context, an instructive case in this court explained when interstate communications could or could not be found sufficient to convict under that statute.  See *U.S. v. Paredes*, 950 F.Supp. 584, S.D.N.Y.,1996 (The Hon. Scheindlin).  In that case, the Court held that intrastate use of defendant's paging system did not satisfy interstate nexus requirement for jurisdiction over a murder-for-hire charge.  However, this case is different.  Defendants used the interstate communications, such as telephone calls to Germany, initiated from New York, to threaten the contact murder of Davidoff.  Furthermore, the disclaimer needs to be made that this case is civil, and the burden of proof is different from the burden in criminal trials.  Additionally, this is only a pleading stage in the civil case, no discovery has been initiated yet, and the factual allegations in the pleading should be taken as true, for purposes of opposing a motion to dismiss.

The Amended Complaint is, however, very specific, alleging on the point at issue as follows:

"83.   Those ever more aggressive threats made by the SHAMAYEVS to DAVIDOFF culminated in SHAMAYEV's phone call to DAVIDOFF that was made on June 14, 2012 at 11:59 P.M. local time in Germany, i.e. 5:59 PM EST in New York.  As the phone records show, that conversation, initiated by SHAMAYEV, lasted 11 minutes.

84.   In that phone call that SHAMAYEV initiated from his phone in New York, knowing that it was already night-time in Germany, he made the threats of the racketeering nature, shouting vulgar obscenities, with the most menacing tonality and implications.

85.     Specifically, SHAMAYEV, speaking on behalf of MICHAEL, BORIS, DAVID and MIT, threatened DAVIDOFF that he would physically harm and crush DAVIDOFF and his family, that he would destroy DAVIDOFF and his family.

86.     Furthermore, SHAMAYEV also said that, unless DAVIDOFF gave up, he intended to contract murdering him.  SHAMAYEV also engaged in a litany of vulgar obscenities addressed to DAVIDOFF and even his family members, shouting on the phone that DAVIDOFF was a thief, fraudster, child molester, homosexual pervert, and the like obscenities."

In light of the exceptional circumstances, Plaintiffs deem it warranted to communicate to the Court that, as mentioned above, after this action was filed, the anonymous "criminal authorities" made several phone calls to Kalimantano in Germany, some calls being traced to Ukraine, demanding to immediately withdraw the Complaint and threatening to carry out Shamayevs' threats to have Davidoff killed.  Plaintiffs realize that they would have to move to supplement the Amended Complaint in order to properly bring that issue before this Court.

Yet, that conduct falls under the prohibitions of another statute that is a part of the RICO Chapter, under Section 1513, 'Retaliating against a witness, victim, or an informant'.  At the time the Shamayevs made the threats themselves, they were aware that Kalimantano and Davidoff were proceeding with the complaints to the law enforcement both in Germany and subsequently in the USA.  Defendants' attempting to downplay the substance of the threats ("a threat of violence from the June 2012 telephone call", MTD Memo, at p. 10) simply misstates the grave allegations in the Amended Complaint, intertwined with the most serious concerns for Davidoff's life.

It is noteworthy that the racketeering jargon used by Eddie Shamayev who was making those threats, was close to one case resolved by the Second Circuit.  In that case, the appellate opinion found that evidence was sufficient to sustain conviction for retaliation against government informant; whether defendant's threats to make informant pay, to cut him till he screamed, and to castrate him, were hyperbole was a matter for jury to decide. *U.S. v. Amor*,

C.A.2 (N.Y.) 1994, 24 F.3d 432.  See also a case where defendant had accused his girlfriend of going to the authorities and threatened to "erase" her if she did any more damage to his life.  *U.S. v. Brown*, C.A.2 (N.Y.) 1991, 937 F.2d 32, certiorari denied 112 S.Ct. 323, 502 U.S. 917, 116 L.Ed.2d 264.

> (5-6) Defendants Directly and Indirectly Invested. or Maintained an Interest in, or Participated; in the Racketeering Enterprise.

Defendants are incorrect when they argue as though Plaintiffs did not allege separate RICO Defendants and a RICO enterprise.  See MTD Memo at p. 13.  Rather the opposite is true, where Plaintiffs took every conceivable step in showing the racketeering enterprise within the four corners of the pleading.  By way of a secondary issue, Defendants also engage in discussing the distinctions between the RICO Sections 1962(a) and 1962(c), inasmuch as those concern the characteristics of the enterprise.   Plaintiffs submit that this is still premature.   Likewise, Defendants argue as though "Plaintiffs never clearly allege what the enterprise actually is, other than the named defendants".  (MTD Memo, at p. 13).  Plaintiffs disagree; it takes only to quote from the Amended Complaint to prove that the enterprise was pled as required.

This case represents essentially a classic situation: the racketeering enterprise, comprising four individuals, Shamayevs, and their corporation, MIT, have been grouped in one location, where the alleged conspiracies were staged.

As the Amended Complaint shows—consistently with the other actions against the same Defendants or their corporation MIT—their enterprise engaged in sophisticated racketeering activities, that included money laundering, receipt and transportation of stolen property, extortion, and, at least in this case, threats to contract murder of a Plaintiff.

Plaintiffs summarized the factual allegations showing that the racketeering enterprise essentially merge with the shop at 56 W 47th Street in Manhattan, being distinct from individual

Defendants and from MIT, the corporation.  This is sufficient for pleading the enterprise, which was done in the Amended Complaint with great particularity, towit:

"132.   At all times relevant hereto, the activities of the SHAMAYEVS were distinct from the racketeering enterprise, that merged with MIT.  It is apparent, that SHAMAYEVS used the MIT as the hub for their racketeering conspiracies.  On information and belief, that extended well beyond the facts concerning the harm caused to Plaintiffs herewith, but the pattern of smuggling goods into the U.S. without imports' clearance, accounting and without paying taxes.

133.   Here, on one occasion, it also included the conspiracy of Defendants around MIT as the racketeering enterprise, that MICHAEL, on information and belief, smuggled the watch item, Patek Philippe, 6970, out of the U.S. and through the German customs' border without declaring the exports and without paying any taxes due on such transactions and profits.

134.   MIT, a shop on the ground floor at the address in Manhattan, represented the center and ad hoc hub for the racketeering activities by the enterprise and, in addition to its corporate registration, should be considered the racketeering enterprise.  On information and belief, that enterprise engaged in the black market activities for the luxury watches, without regard to the due accounting."

It also goes without saying that the Shamayevs and MIT benefitted from the racketeering enterprise, in which they invested and from which they derived illegal income.  In this case, the Amended Complaint alleges the separate instances when those Defendants obtained illegal revenues from their enterprise.

As mentioned above, the first episode, pled in the Amended Complaint, relates to 2009 and it involved the victim, Kushnir, the principal of Perfection ZAO in Almaty, Kazakhstan, who assigned his claims to Plaintiff Schwengler.  See Para 27-28.  As shown above, the *Lermian* and other case law indicate that assignment of RICO claims is a valid proposition on the law.

In that instance, the enterprise obtained $400,000, a part of which was lost for Kushnir, and, vice versa, became in part the illegal profit for the enterprise.  The next episode concerned a $65,000 transaction, the victim of which was Tokhtar Tuleshov ("Tuleshov"), who, likewise,

assigned his claims to Schwengler.   Like with the prior transaction, Defendants, again, profiteered from their illegal conduct.[2]  See Para 31-33.

As pled with great detail in Para 35-69, Defendants then illegally obtained $120,000 and €135,000 (representing about $173,300 at the rate of exchange on the day of Defendants obtaining that cash in bank notes).

Therefore, the conclusion that the Court may and should make is that all the seven elements necessary for pleading the RICO cause of action have been adequately alleged in the Amended Complaint.

Plaintiffs concede that they still do not have the very important documentary evidence, namely the Bank of America's records from MIT's account.   However, Plaintiffs could not possibly have that documentary evidence, because discovery has not been allowed in this case so far.  It will take a subpoena to Bank of America to obtain that evidence and to expose what Defendants did with all those moneys wired to them.   It would also take a deposition of Defendants Michael Shamayev to learn what he did with €135,000 in cash he took in Frankfurt, Germany.

**5.      Defendants' Attacks on State-Law Claims Are without Merit.**

Defendants' Memorandum consistently suffers from their generalizations without pointing to quotations or portions of the Amended Complaint.  Even the rare references to certain paragraphs do not reflect what those paragraphs actually allege.  Defendants' Memorandum, vice versa, is marked by the deficiencies of which they accuse Plaintiffs' pleading.  For example, Defendants' Memorandum argues: "A close look at the allegations of the Amended Complaint

---

[2]  The fact that at two victims assigned their claims may be explained by the fact that victims have fears of Shamayevs' retaliation, based on their reputation and alleged connections in the underworld, and rather would have the claims assigned.

reveals that in reality Plaintiffs' chief complaint sounds in breach of contract." (Ibid, at p. 14). However, Defendants do not explain what their "close look" means, ignoring the facts, as those are pled, and consistently refusing to quote from the Amended Complaint.  Defendants then simply misstate the facts pled by Plaintiffs.

According to Defendants, the recovery in this case is barred by the economic loss rule. (See MTD Memo, at p. 14).  However, Defendants completely misapplied the economic loss rule, which is misplaced for the facts and claims in the case at bar.

In a case that explains that rule under New York law, *Atlas Air, Inc. v. General Elec. Co*., 16 A.D.3d 444, 791 N.Y.S.2d 620, N.Y.A.D. 2 Dept.,2005, the court said:

> The economic loss rule provides that tort recovery in strict products liability and negligence against a manufacturer is not available to a downstream purchaser where the claimed losses flow from damage to the property that is the subject of the contract and personal injury is not alleged or at issue ( see Bocre Leasing Corp. v. General Motors Corp. [ Allison Gas Turbine Div.], 84 N.Y.2d 685, 621 N.Y.S.2d 497, 645 N.E.2d 1195; Amin Realty v. K & R Constr. Corp., 306 A.D.2d 230, 231, 762 N.Y.S.2d 92). The rule is applicable to economic losses to the product itself as well as consequential damages resulting from the defect ( see Bocre Leasing Corp. v. General Motors Corp. [ Allison Gas Turbine Div.], supra at 693, 621 N.Y.S.2d 497, 645 N.E.2d 1195; Amin Realty v. K & R Constr. Corp., supra at 231, 762 N.Y.S.2d 92).

Defendants here, however, are not sued under strict product liability or for negligence against a manufacturer.[3]   The facts at bar could not be further from those propositions. Inexplicably, while discussing that theory of recovery, Defendants "forget" that they received, among other things, $120,000 that, as Plaintiffs allege, they essentially, stole.  It serves purpose to eliminate as misplaced Defendants' discussion on the law of the "economic loss rule", on which basis Defendants argue the Court "must" dismiss the complaint (see Footnote 6, p. 14).

Reverting to the Amended Complaint, Plaintiffs pled, inter alia:

---

[3] As mentioned above, rather manufacturers sue these Defendants for fraud and tampering with their products.

"80.     Furthermore, SHAMAYEV, MICHAEL and BORIS, completely changing their story, started to belately fraudulently claim that MIT's account at Bank of America was never credited with $120,000 towards the new purchase of the items ordered by DAVIDOFF and KALIMANTANO on January 5, 2012.  However, those two wire transfers money were never returned back to KALIMANTANO through the banking channels and those moneys must have been credited on MIT's account."

The question then should be raised, in a representative instance, what does the argument concerning Defendants' alleged illegally taking the $120,000 have anything in common with the "economic loss rule"?

### 6.     Breach of Contract Count Was Adequately Pled.

Defendants argue that, basically, the Amended Complaint's Counts in tort negate Count I, pled under the law of contract.  There is, however, nothing contradictory in pleading various and alternative theories of recovery, some of which may be awarded in the alternative.  Indeed, if Plaintiffs recover on conversion, this may supersede a claim under the law of contract.

However, it is premature for Plaintiffs to elect one or another remedy, which, ultimately, are fact-driven and are to be decided on by the fact finder.  Whether there was a "meeting of the minds" of the parties, to support the existence of contracts, or not, is a factual issue to be resolved by jury.  Defendants themselves contradict themselves.  On numerous occasions in their MTD Memorandum, Defendants argue that instead of the RICO claims, Plaintiffs should sue on contract law.  Then they claim that suing under contract is also unavailable, in a 'catch-22' argument, all without basis.

Defendants, however, ignore that it is well established that plaintiffs may plead alternative theories of recovery.  See *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 727 F.Supp.2d 256, S.D.N.Y.,2010.  The courts are essentially concerned with a possibility of double recovery, prescribing that in the ultimate judgment relief should not be duplicative, towit:

Where a party receives relief "under one theory of recovery and is restored to the same economic position he would have occupied if the contract had been honored, there is no reason to accept alternative theories of recovery." DVCi Techs., 2000 WL 33159189, at *3; see also Adams v. Lindblad Travel, Inc., 730 F.2d 89, 94 (2d Cir.1984).

However, Plaintiffs fully realize that relief under the count of conversion may negate relief under contract. Again, this does not prohibit pleading the theories of recovery in the alternative, to conform to the evidence ultimately to be weighed by the fact finder. It is far too premature to elect the theories of recovery at the present pleading stage.

### 7. Count under Conversion Was Adequately Pled.

Defendants wish to dismiss Count III ('Conversion') on the basis that "money cannot be the subject of a cause for conversion unless the particular monies are be (sic) specifically identified and segregated". (MTD Memo, at p. 16).

However, this is exactly the situation with €135,000 in bank notes, released by the bank branches and ATMs in Frankfurt. That money actually can be identified. Again, one needs to revert to the Amended Complaint, that shows how the banknotes in Euros were counted and taken, for conversion purposes, by Michael Shamayev, towit:

"55.   DAVIDOFF and FELDE accompanied Dossanbayev and Azizov to the room, where MICHAEL was staying, Room No. 426.

56.   MICHAEL then counted the tendered cash in the Euros bank notes, in the presence of four persons: DAVIDOFF, FELDE, as well as the foreign buyers, Dossanbayev and Azizov, who were eye witnesses.

57.   Upon physically counting the bank notes, by hand, €143,000 (in Euros) in his room, MICHAEL confirmed that the amount tendered in cash was correct..."

The Amended Complaint then shows how Michael Shamayev allegedly illegally carried that cash through the border check point in Frankfurt, en route to New York, presumptively not declaring those identifiable bank notes in Euros, as required by the law. Plaintiffs acequately

19

showed how that cash in the Euros bank notes was retrieved from the bank branches and ATM machines, per demand of Michael Shamayev, only to receive a fraudulent item (that Defendants knew to be defective).   This warrants undoing that purported transaction on the basis of conversion.

Furthermore, these bank notes are not in free circulation or acceptable in the United States.   Those bank notes were identifiable in the bank system in Frankfurt, Germany, and it is plausible that Defendants still keep that identifiable cash, all in the same identifiable bank notes. The claim for conversion is therefore properly stated.

**8.      Count Based on Money Had and Received Was Even not Challenged by Defendants.**

The narrative in Defendants' Memorandum unexpectedly passes from attacking Counts III to Count V, leaving Count IV, 'Money Had and Received' unchallenged.   To refresh, Plaintiffs summarized the cause of action under that count as follows, with the total of $383,300:

"152.   Defendants obtained $65,000 in about November of 2010.   Then Defendants obtained $120,000 on their account at Bank of America in the name of MIT, on January 5, 2012. Thereupon, Defendants denied receiving that money and, on information and belief, used those funds for themselves, without any benefit to Plaintiffs.

153.   Likewise, MICHAEL demanded to obtain cash, for the amount of €135,000, representing $173,300 at the exchange rate of the day of the Euros into the dollars.   In this proceeding Plaintiffs also demand that Defendants accepted their defective watch Patek Philippe, 5970, currently held in trust in Germany, through FELDE, who is the designated trustee and assignee for purposes of asserting these claims, in exchange to the refund of the moneys paid.

154.   Thus, the total of the moneys had and received by or through the Defendants amounted to $358,300."

Apparently, Defendants had nothing to say on Plaintiffs' entitlement to sue under that Count.   Consequently, the Court should rule that, because Defendants failed to address that Count, it should be treated as unchallenged.

**9.      Count for Fraudulent Conveyances Was Properly Pled.**

According to Defendants, Plaintiffs are not entitled to relief under fraudulent conveyances law, stated under Count V, because "only a creditor may seek to unwind a transfer pursuant to New York law." (MTD Memo, at p. 16).

Defendants fail to recognize that when Plaintiffs wire transferred $120,000 to MIT's account, they actually became creditors of MIT as to that advance payment. The Amended Complaint is specific, even annexing the banking copies of the two wire transfers.

In one instance, the Amended Complaint showed, with specificity:

"64.    Exhibits A and B annexed to the Complaint represent the banking records showing those advance payments for those orders, for the total of $120,000. The balance was to be paid by KALIMANTANO separately, upon the actual delivery of the ordered items from MIT, eventually again to Frankfurt."

There is nothing inconsistent with the case law Defendants cited. Under the provision of New York Debtor and Creditor Law governing transfers made with the actual fraudulent intent, a conveyance may be set aside by any creditor of the transferor. *Eberhard v. Marcu*, C.A.2 (N.Y.)2008, 530 F.3d 122.   In another case, the court said that under New York fraudulent conveyance statute, a conveyance will be set aside regardless of the adequacy of consideration where the party seeking to set aside the conveyance can prove the debtor's actual intent to hinder and delay creditors. *Aaron v. Mattikow*, 2004, 225 F.R.D. 407.

**10.    Counts for Fraud and Misrepresentation Were Adequately Pled.**

Plaintiffs agree with Defendants' enumerating five elements of the claims for fraud and misrepresentation. However, Plaintiffs completely disagree when Defendants argue as though "in Counts VI and VII Plaintiffs fail to properly make out these claims". (MTD Memo, at p. 17).

This is what essentially Plaintiffs summarized in the Amended Complaint:

"162. The SHAMAYEVS acting on behalf of MIT, and all of them engaged in (1) a misrepresentation or omission of the material facts; (2) which SHAMAYEVS knew those misrepresentations to be false; (3) SHAMAYEVS made with the intention of inducing reliance

by KALIMANTANO, DAVIDOFF and FELDE; (4) upon which KALIMANTANO, DAVIDOFF reasonably relied; and (5) which conduct caused injury KALIMANTANO, DAVIDOFF, as well as SCHWEGLER and FELDE as the assignees of the ultimate victims."

For example, it suffices to quote from the Amended Complaint the description of the episode when Michael Shamayev sold a faulty watch in the Hilton Hotel room in Frankfurt, where all these elements are highlighted, towit:

"54.   Upon withdrawing the necessary money in cash, the visitors returned to the Hilton hotel to meet with MICHAEL and to complete the purchase of the item that MICHAEL had shown. The price was €143,000, calculated to match $175,000 at the exchange rate of the day. **MICHAEL assured that the watch was new, certified and in an impeccable condition. The customers relied on MICHAEL's assurances.**"  (Highlighting added).

**11.   Count under Civil Conspiracy Was Adequately Pled.**

In their unusual style of commanding the Court what to do, in just one paragraph concerning Civil Conspiracy, Defendants, even twice, tell the Court that this cause of action "must be dismissed".  (MTD Memo, p. 18).  In support of their demand, Defendants state: "Because each of the defendants is already named in Plaintiffs' other tort counts, Count VIII must be dismissed".  (Ibid, p. 18).

However, Plaintiffs do not know at this stage if the conspiracy consisted only of four individuals and their corporation, MIT.  For that reason, the cover page of the Amended Complaint, right in the caption, after enumerating five Defendants, also adds: "and DOES from 1 to 100".

At this stage, before discovery was allowed, it is premature to dismiss that Count as duplicative, because the civil conspiracy may extend beyond the tort claims asserted against the present five Defendants.

**12.   Count under Unjust Enrichment Was Adequately Pled**.

As shown above, nothing under the Federal Rules of Civil Procedure prohibits Plaintiffs to plead alternative theories for recovery.  There is no need to juxtapose Defendants' statements, e.g. that one theory is unavailable and should be dismissed and then Defendants, turning to another theory, argue that that, vice versa, the other theory of recovery is unavailable, because the first is available, contradicting themselves.  Plaintiffs agree that where a remedy at law exists, relief in equity would be superseded.  With that disclaimer, Plaintiffs submit that this Count as pled satisfies all three elements of an unjust enrichment claim under New York law.

Namely, as shown above, Defendants (1) benefitted, in the aggregate, from over $0.3 million; (2) at Plaintiffs' or their assignors' expense; and (3) equity and good conscience require restitution.  On the latter point, that restitution needs to start with $120,000 wire transferred to MIT's account at Bank of America, which funds they are not entitled to withhold.[4]

### 13.    Count under Defamation Was Adequately Pled.

Plaintiffs disagree with Defendants as though they did not identify who among Defendants made defamatory statements on the website, upon registering the domain using Tofik Davidoff's full name.  In fact, Plaintiffs pointed to David Shamayev, who apparently acted on the directives of the entire enterprise, towit:

"93.    On information and belief, the SHAMAYEVS purchased a website domain, www.tofikdavidoff.com, creating a fraudulent website with the logo "Tofik Davidoff: A Man You Can't Trust".

94.    On that website, misusing another person's name, the SHAMAYEVS posted a so called "Stolen Watch Alert".  They falsely accused DAVIDOFF as though he had "stolen" the watch, Patek Philippe, Ref. No. 5970P-001, Serial No. 3931765/4500264.  That was the same watch that DAVIDOFF had helped MIT sell to the customers in Kazakhstan and then attempted to have returned and moneys paid refunded, once the watch was determined to be defective.

---

[4] Plaintiffs anticipate being able to file a Motion for partial summary judgment on that claim promptly after the subpoena to Bank of America is allowed in the discovery process and the banking documents are received.

95.     That website was maliciously created, according to the website records and investigation, by DAVID, who essentially hijacked another person's identity, to create a defamatory website in DAVIDOFF's name.  The SHAMAYEVS' conduct was to continuously harm DAVIDOFF and KALIMANTANO, carrying out their criminal scheme to destroy them."

### 14.     Count under Tortious Interference with Business Relations Was Adequately Pled.

Defendants argue that Count XI should be dismissed because it is "duplicative" with Count X ('Defamation').  Plaintiffs disagree.

Plaintiffs showed that Kalimantano has been a successful ongoing enterprise in the wholesale business of foodstuffs in Germany, being in business for a number of years.  Its founder and principal Davidoff is the driving force for that success, and the customers associate him with Kalimantano.  With regard to the food industry, where customers are very sensitive to the questions of reliability of foodstuffs' suppliers, this attack was especially harmful to that business.  The Amended Complaint seeks to recover at least $1 million, see Para 131, towit:

"131. Furthermore, the SHAMAYEVS' purposefully posted at least a dozen of patently offensive, brazen and false accusations and "alerts" against KALIMANTANO and DAVIDOFF, in light of the damage to the ongoing successful wholesale business with foodstuffs in Germany, with the international scope of trade, could be assessed at over $1 million."

The numerous postings by Defendants on the Internet were nearly all supplemented by a statement: "Tofik Davidoff.  A Man You Can't Trust."  Ref. Para 93.  However, this is clearly targeted to ruin Kalimantano's and Davidoff's ongoing business relationship.

### 15.     Count for Injunctive Relief Was Adequately Pled.

Like with nearly all other counts, Defendants only engaged in generalizations as though Plaintiffs "…have utterly failed to assert proper legal or factual basis for injunctive relief". (MTD Memo, at p. 21).  However, Defendants did not even approach reviewing the basis for claiming that relief.  The relief sought by Plaintiffs is relatively straightforward:

"222.  Defendants should be ordered to immediately stop making their false, malicious and virulently fraudulent attacks on DAVIDOFF and KALIMANTANO.  They should also be ordered to withdraw or deactivate all their postings on the Internet that they undertook after June 15, 2012.

223.  Defendants should also be ordered to delete the defamatory website www.tofikdavidoff.com, created for extortionist purposes, intimidation and for causing ongoing damage to the reputation of KALIMANTANO and DAVIDOFF, and be prohibited from such conduct concerning DAVIDOFF and KALIMANTANO in the future."

Defendants failed to explain why they believe that this Court has no power to order such injunctive relief and what are the grounds to contest such relief pled in the Amended Complaint. Defendants are also mistaken as to the present stage of the litigation, which is the pleading stage, attempting to oppose a possible future Motion for preliminary injunction.  It has not come yet to a Motion for preliminary injunction, at which stage the factual grounds for that relief would be weighed on Affidavits upon the evidence to be submitted.  This stage is only about asserting relief that is permitted under the applicable law concerning injunctive relief.

## <u>Conclusion</u>.

Defendants' Motion should be denied in its entirety.

Respectfully submitted:

Dated: December 27, 2012

Peter A. Joseph, Esq.
Bar PJ-9723
177 Waverly Place # 5F
New York, NY, 10014-3552
Tel. (212) 924 1498

/s/_____
GEORGE LAMBERT (D.C. Bar No. 979327),
Pro hac vice
LAW OFFICES OF LEONARD SUCHANEK
1025 Connecticut Avenue, #1000, NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (202) 747 7797
Attorneys for All Plaintiffs

25