UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                         :

KALIMANTANO GMBH, et al.,              :

                                   :          12 Civ. 6969 (PAE)

                      Plaintiffs,     :

                                   :        OPINION & ORDER

             -v-                :

                                   :

MOTION IN TIME, INC., et al,        :

                                   :

                    Defendants.    :

                                   :

------------------------------------------------------------------------X

**PAUL A. ENGELMAYER, District Judge:**

       Plaintiffs Kalimantano GmbH ("Kalimantano"), Tofik Davidoff ("Davidoff"), Konstantin Felde ("Felde"), and Johannes Schwegler ("Schwegler") (collectively, "Plaintiffs") bring suit against defendants Motion in Time, Inc. ("MIT"), Eddie Shamayev ("Eddie"), Michael Shamayev ("Michael"), Boris Shamayev ("Boris"), and David Shamayev ("David") (collectively, "Defendants"), alleging violations of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and New York statutory and common law. Defendants move to dismiss the Amended Complaint, under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim. For the reasons that follow, the Court grants in part and denies in part Defendants' motion.

## I.  Background[1]

Kalimantano is a German company based near Frankfurt am Main, Germany ("Frankfurt").  Am. Compl. ¶ 1.  Since its founding in 2001, Kalimantano's principal business has been selling wholesale foodstuffs to customers within Germany.  *Id.*  Davidoff, one of Kalimantano's operating managers and principals, helped Kalimantano purchase luxury watches, and in so doing became acquainted with Defendants.  *Id.* ¶¶ 2, 39.

MIT is a New York-based corporation founded in 2004.  MIT's principal business is selling, buying, and reselling jewelry and watches, particularly luxury brands.  MIT interacts with customers via its New York City store, its website www.motionintime.com, and direct email advertisements and solicitations.  *Id.* ¶ 5.

The Amended Complaint refers to three transactions, in which, it is alleged, MIT deceived buyers of expensive watches.  The Court addresses these transactions in chronological order.

### A.   The Tuleshov Transaction

In October or November 2010, the Amended Complaint alleges, Tokhtar Tuleshov ("Tuleshov"), a customer in Kazakhstan, ordered a Swiss watch from MIT through an agent named Yuri X (the "Tuleshov Transaction").  *Id.* ¶ 31.  Tuleshov negotiated for Yuri to hand-deliver a brand new Blancpain Tourbillon watch to him in Kazakhstan from MIT's New York store, for which Tuleshov would pay $65,000.  *Id.*  The Amended Complaint alleges that, approximately one day after Tuleshov paid the money and the watch arrived in Kazakhstan, the

---

[1] The facts related herein are drawn from Kalimantano's Amended Complaint ("Am. Compl."), Dkt. 13.  In reviewing a motion to dismiss under Rule 12(b)(6), the Court accepts the factual allegations set forth in the complaint as true and draws all reasonable inferences in favor of the plaintiff.  *See, e.g.*, *Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.2d 309, 311 (2d Cir. 2012); *Holmes v. Grubman*, 568 F.2d 329, 335 (2d Cir. 2009); *Chambers v. Time Warner, Inc.*, 282 F.2d 147, 152 (2d Cir. 2002).

watch stopped working.  *Id.* ¶ 32.  Yuri took the watch to an authorized Blancpain dealer in

Kazakhstan for repairs; the dealer determined that the watch was at least two years old and had

already been repaired at least once.  *Id.* ¶ 33.  This dealer charged Tuleshov €16,000 for the new

repairs.  *Id.*  When Tuleshov attempted to return the watch to MIT, the Defendants refused to

take back the item.  They tried to convince Tuleshov not to pursue his claims against MIT.  *Id.*

Tuleshov is neither a plaintiff in this action nor an employee of Kalimantano.  The

Amended Complaint argues, however, that Tuleshov's claim is properly considered among the

allegations in this action, because he is alleged to have assigned to plaintiff Schwegler, an

associate manager of Kalimantano, his claim for the damages arising from the purchase of the

watch and for its repairs.[2]  *Id.* ¶¶ 30, 34.

### B.  The Frankfurt Transaction

The Amended Complaint centers on a different transaction: between Kalimantano and

Michael Shamayev (on behalf of MIT) in January 2012 (the "Frankfurt Transaction").  The

Amended Complaint alleges that, in 2009, Davidoff began receiving promotional emails from

MIT offering discounts on luxury watch brands.  *Id.* ¶ 36.  In December 2011, two years later,

three of Davidoff's trading partners in Kazakhstan ("the trading partners") asked him to help

them get a good deal on luxury watches.  Davidoff, recalling the promotional emails he had

received from MIT, arranged for his trading partners to travel to Frankfurt to meet with Michael

to purchase a Swiss Patek Phillipe watch for €143,000.  *Id.* ¶¶ 39–42.

On January 4, 2012, Davidoff picked up Michael from the Frankfurt airport and brought

him to the Hilton Hotel in Frankfurt.  *Id.* ¶ 44.  That same morning, Felde, an operating manager

---

[2] RICO claims are assignable.  *See Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74
F. Supp. 2d 221, 228 (E.D.N.Y. 1999) (collecting cases).  Whether Schwegler and Felde, both of
whom have been assigned claims, have standing to bring RICO claims against Defendants need
not be resolved here, in light of the Court's dismissal of the RICO claims.

at Kalimantano, picked up the trading partners and brought them to the hotel lobby to meet Michael. *Id.* ¶¶ 45–46. There, Michael announced, allegedly for the first time, that he would accept payment only in cash for the watch. *Id.* ¶¶ 47–49. The trading partners then called their colleagues in Kazakhstan to arrange for cash withdrawals from banks within Frankfurt for accounts belonging to two of the partners, Nurgali Dossanbayev ("Dossanbayev") and Ruslan Azizov ("Azizov"). *Id.* ¶ 50. To procure the cash, Dossanbayev and Azizov had to leave the hotel to visit various ATMs throughout Frankfurt. When Dossanbayev and Azizov returned to the hotel, Davidoff and Felde brought them to Michael's hotel room to complete the transaction. *Id.* ¶ 55. Dossanbayev and Azizov then gave Michael €143,000 in cash for him to count. Michael then passed the Patek Phillipe watch, in a box, to one of the trading parties, representing that the watch was new, certified and in impeccable condition. *Id.* ¶ 57. Michael then gave Davidoff €8,000 out of the €143,000 total for Davidoff's work as an intermediary for the sale, as well as to reimburse Kalimantano for buying Michael's round trip plane ticket and hotel room in Frankfurt. *Id.* ¶ 58. That evening, Michael, Davidoff, Davidoff's wife and Azizov celebrated the transaction over dinner at a restaurant in Frankfurt. *Id.* ¶ 59.

### C. The Davidoff Transactions

On January 5, 2012, the day after the Frankfurt Transaction, Davidoff sought to make two more purchases from MIT on behalf of Kalimantano (the "Davidoff Transactions"). *Id.* ¶ 62. The first was for another Patek Phillipe watch; the second was for an order of 500 Audemars Piguet Montoya watches. *Id.* Davidoff arranged for a wire transfer from Kalimantano's Commerzbank account for two separate down payments for the two purchases, one for $50,000 and one for $70,000. *Id.* ¶ 63. Davidoff planned to pay the balance of the two orders once he received the watches in Frankfurt. *Id.* ¶ 64. At some point during Davidoff's

negotiations with Michael that day, Michael suggested that instead of waiting, Davidoff should immediately wire MIT $125,000, the remaining balance of the two orders. Davidoff agreed and arranged for another wire transfer of $125,000 from Kalimantano's bank account. *Id.* ¶ 65.

On January 6, 2012, Davidoff took Michael to the airport in the morning. Because of the tight schedule of Michael's trip, Davidoff did not believe Michael had time to deposit the €135,000 in cash from the Frankfurt Transaction into a bank account. *Id.* ¶ 67. Plaintiffs assert that, accordingly, Michael would have had either to take the €135,000 in cash through Customs and declare it, or fail to declare the cash and violate U.S. Customs laws. Before arriving at the airport, Michael requested that Davidoff help him catch his flight through a VIP lounge, because Davidoff had access to the lounge as a "known businessman in Frankfurt." *Id.* ¶ 68. At this point, Davidoff relates, he became suspicious that Michael was trying to circumvent Customs and might not be a bona fide dealer of luxury watches. *Id.* ¶ 70. After dropping Michael off at the airport, Davidoff went to Commerzbank to check on the status of the three wire transfers to MIT, for $50,000, $70,000 and $125,000. The $50,000 and $70,000 transfers had cleared, but the $125,000 transfer was still pending. Davidoff canceled the $125,000 wire and communicated to Michael that he would send it once MIT confirmed that the watches were ready for delivery. *Id.* ¶ 71.

Later in January, Davidoff repeatedly called MIT and the Shamayevs to ask about the status of the two orders. *Id.* ¶ 73. Each time, someone at MIT told Davidoff that the orders were not yet ready but would be at an unspecified later date. *Id.*

### D. The Discovery that the Watch Sold to the Trading Partners Was Used

At some time after the trading partners returned to Kazakhstan with the Patek Phillipe watch, Dossanbayev and Azizov contacted Kalimantano and reported that the watch was used

and appeared to have been repaired.  *Id.* ¶¶ 74, 76.  Dossanbayev and Azizov discovered this by

taking the watch to an authorized retail shop in Kazakhstan, which traced the watch's

identification number and discovered that the watch had been produced by Patek Phillipe in

2010, not 2011.  *Id.* ¶ 75.  The trading partners demanded that Davidoff and Kalimantano return

the €143,000 they had paid for the watch.  *Id.* ¶ 78.  The Kazakhstan partners gave the Patek

Phillipe watch back to Felde, made him liable for the €143,000, and assigned him all their claims

arising from the Frankfurt Transaction.  *Id.* ¶ 107.  The Shamayevs and MIT, however, denied

that the watch was used; they refused to refund the €135,000 that Michael had received for the

watch.  The Shamayevs also claimed—allegedly falsely—that they had never received the

$50,000 and $70,000 that Kalimantano had paid on January 5, 2012.  *Id.* ¶ 80.

### E.   The Threatening Phone Calls to Davidoff

At some point between the end of January 2012 and June 14, 2012, the Shamayevs in

New York began to call Davidoff in Germany and threaten his safety if he did not stop seeking

refunds from the Frankfurt and Davidoff Transactions.  *Id.* ¶ 82.  On June 14, 2012, Eddie called

Davidoff at midnight in Germany, shouting obscenities and threatening to physically harm

Davidoff and his family.  Eddie also stated that he would contract for Davidoff's murder.  *Id.*

¶¶ 83–86.  On June 18, 2012, Kalimantano and Davidoff lodged a formal complaint against the

Shamayevs with the Attorney General of Hessen Province in Germany.  *Id.* ¶ 9.

### F.   The Defamatory Website

The Amended Complaint also alleges that David Shamayev, Eddie's son, created a

fraudulent website at www.tofikdavidoff.com with the tagline "Tofik Davidoff: A Man You

Can't Trust."  *Id.* ¶ 93.  There, the Shamayevs accused Davidoff of stealing the Patek Phillipe

watch from the Frankfurt Transaction.  Plaintiffs allege that this website defamed Davidoff and Kalimantano and damaged their business relationships in Germany.

### G.  Procedural History

On September 14, 2012, Plaintiffs filed the original complaint, Dkt. 1, bringing 12 causes of action and seeking damages, injunctive, and declaratory relief.  On October 22, 2012, MIT filed a motion to dismiss.  Dkt. 6.

On November 14, 2012, Plaintiffs filed an Amended Complaint.  Dkt. 13.  There, they allege 12 causes of action, namely:  (1) civil RICO, in violation of: 18 U.S.C. § 1962(c), based on predicate acts of mail and wire fraud, 18 U.S.C. §§ 1341 & 1343; money laundering, 18 U.S.C. §§ 1956–1957; receipt and transportation of stolen moneys in excess of $5,000, 18 U.S.C. §§ 2314–2315; witness tampering, 18 U.S.C. §§ 1512–1513; and use of interstate commerce facilities in commission of murder-for-hire, 18 U.S.C. § 1958; (2) breach of contract; (3) conversion; (4) money had and received; (5) fraudulent conveyances; (6) fraud; (7) misrepresentation; (8) civil conspiracy; (9) unjust enrichment; (10) defamation; (11) interference with business relationships; and (12) injunctive relief.

On December 3, 2012, MIT moved to dismiss the Amended Complaint, Dkt. 15, and submitted an accompanying memorandum of law ("MIT Br.").  Dkt. 16.  On December 27, 2012, Plaintiffs filed an opposition brief ("Kalimantano Br.").  Dkt. 18.  On January 4, 2013, MIT filed a reply brief ("MIT Reply Br.").  Dkt. 21.

Also on December 27, 2012, Plaintiffs asked the Court to take judicial notice of two other proceedings involving MIT ("Kalimantano RJN Br.").  Dkt. 19.  On December 28, 2012, MIT moved to strike that request, and to strike any facts from plaintiffs' brief that did not appear in the Amended Complaint ("MIT MTS Br.").  Dkt. 20.

On January 11, 2013, Plaintiffs filed a cross-motion to amend or correct the motion to strike and a motion for leave to supplement the Amended Complaint, along with an accompanying memorandum of law ("Kalimantano Cross-Motion Br."), Dkt. 25, and a declaration from Tofik Davidoff ("Davidoff Decl."), Dkt 24.  On January 11, Plaintiffs filed their opposition to MIT's motion to strike ("Kalimantano MTS Opp. Br.").  Dkt. 26.  On January 21, 2013, MIT filed a reply brief in further support of that motion ("MIT MTS Reply Br.").  Dkt. 30. On January 28, MIT filed its opposition to the cross-motion to amend or correct the motion to strike and to supplement the pleadings ("MIT Cross-Motion Opp. Br.").  Dkt. 31.  On January 29, 2013, Plaintiffs filed a reply in support of the cross-motion to amend or correct the motion to strike and the motion to supplement the pleadings ("Kalimantano Cross-Motion Reply Br."). Dkt. 32.

On January 31, 2012, the Court held argument on these motions.  *See* Transcript of January 31, 2013 Oral Argument, Dkt. 33 ("Tr.").

## II.     Applicable Legal Standards

### A.   On a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  To state a claim for relief that is facially plausible, an allegation must be "more than an unadorned, the-defendant-unlawfully-harmed me accusation"; a claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Accordingly, where a plaintiff has not "nudged [his

or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

In making that determination, a court may look to the pleadings as well as to any documents integral to the complaint upon which the pleadings rely. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). A court must accept as true all well-pleaded factual allegations in the complaint, and "draw[] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006) (internal quotation marks and citation omitted).

### B.   On a Motion to Supplement

To fortify their RICO claim, Plaintiffs seek to supplement their pleadings pursuant to Federal Rule of Civil Procedure 15(d) with additional facts about MIT's allegedly unlawful activities that occurred between the filing of the original and amended complaints. Opposing this bid, Defendants argue that a supplemental pleading can only "set[] out any transaction, occurrence or event that happened *after the date of the pleading to be supplemented*." MIT Cross-Motion Opp. Br. 2 (emphasis in original). Because these averments could have been included in the Amended Complaint, MIT argues, Plaintiffs cannot supplement the pleadings with them. *See* MIT MTS Reply Br. 3–5. Plaintiffs claim they did not know it was permitted to add facts when filing an Amended Complaint. *See* Kalimantano Cross-Motion Br. 5.

Rule 15(d) permits the court to allow a party to supplement its pleadings "setting out any transaction, occurrence, or event that happened after the date of the pleadings to be supplemented." Fed. R. Civ. P. 15(d). Such a motion should be freely granted "[a]bsent undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility." *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995). "Futility"

9

under Rule 15 turns on whether the proposed pleading would state a claim upon which relief could be granted.  *Dougherty v. N. Hempstead Bd. of Zoning Appeals*, 282 F. 3d 83, 87–88 (2d Cir. 2002).  The Court accordingly considers the factual allegations both in the Amended Complaint and in Plaintiffs' proposed supplement, so as to enable a determination whether the motion to supplement would be futile.

### C.   On a Motion for Judicial Notice

Plaintiffs also ask the Court, under Federal Rule of Evidence 201, to take notice of filings from two actions brought by other plaintiffs against MIT: a judgment in *Cartier v. Aviannes, Inc.*, No. 05 Civ. 9976 (LTS), Dkt. 111; and the complaint in *Cartier v. Motion in Time*, No. 12 Civ. 8216 (JMF), Dkt. 1.  *See* Kalimantano RJN Br. 1.  Under Rule 201, a court must take notice of court filings if a party so requests and the court is supplied with the necessary information.  Fed. R. Evid. 201(c)(2).  However, a court may take judicial notice of a document filed in another court "not for the truth of the matter asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  *Liberty Mut. Ins. Co. v. Rotches Pork Packers Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992).  As such, the Court here takes judicial notice of the existence of these two filings, but not of the truth of the claims made therein.  Importantly, the facts alleged within these documents are not part of the Amended Complaint, as they were neither included within nor appended to it.  These allegations therefore may not be used, as plaintiffs evidently seek, to bolster their civil RICO claim.

## III.   Discussion

### A.      Civil RICO Claim

The civil RICO statute, 18 U.S.C. § 1962(c), makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or

foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  "To establish a claim for a civil violation of section 1962(c), 'a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994)).

Plaintiffs' thesis in their RICO claim is that MIT is a RICO enterprise.  They allege that through that enterprise, the four individual defendants—Eddie, Michael, Boris, and David Shamayev—engaged in an open-ended pattern of racketeering activity, which entailed more than "10 instances of wire and mail fraud" that lasted "for several years to date."  Am. Compl. ¶ 111. They appear to claim that the email advertisements sent by MIT to Davidoff starting in 2009 were fraudulent proposals sent across national borders in violation of the wire fraud statute, 18 U.S.C. § 1343, Am. Compl. ¶ 112; that the defendants also engaged in several instances of money laundering, *id.* at ¶¶ 114–121; and that the threatening phone calls it alleges, described in the Amended Complaint and in the motion to supplement, from the Shamayevs (or their alleged agents) to Davidoff, reveal an open-ended pattern of racketeering activity because the threats contemplate "causing [harm], including . . . murder, in the future."  *Id.* at ¶ 136.

The Court considers the RICO elements—conduct (requiring two or more predicate acts), an enterprise, and a pattern of racketeering activity—in turn.

### 1.  Two or More Predicate Acts

To be liable under the RICO statute, a defendant must commit "at least two acts of racketeering activity," "the last of which occurred within ten years . . . after the commission of a

prior act of racketeering activity."  18 U.S.C. § 1961(5); *see DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (internal citation omitted).

The Amended Complaint adequately pleads this element.  It specifies individual instances of alleged mail or wire fraud corresponding to the allegedly fraudulent watch-sale transactions chronicled above.  Thus, whether or not the claims of witness tampering, extortion, and money laundering are too nebulous and conclusory to constitute adequately pled predicate acts, the Amended Complaint's claims of fraudulent statements directed at identifiable customers for the purpose of inducing them to buy purportedly (but in reality not) brand-new watches fairly alleges this element of a RICO claim.  The allegations in the Amended Complaint therefore satisfy the first prong of a RICO claim.

### 2. An Enterprise

A RICO enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "To establish liability under §1962(c), [the plaintiff] must allege and prove the existence of two distinct entities; (1) a 'person'[,] and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).  In other words, the defendant and the enterprise must be distinct.  *DeFalco*, 244 F.3d at 306.  An employee who conducts the affairs of a corporation through illegal acts is himself separate from the corporation.  A RICO enterprise may be a lawful entity or an association-in-fact.  *Boritzer v. Calloway*, No. 10 Civ. 6264 (JPO), 2013 WL 311013, at *5 (S.D.N.Y. Jan. 24, 2013).

Here, the Amended Complaint alleges that individual defendants—the Shamayevs—used MIT as the vehicle for their predicate acts of fraud.  Am. Compl. ¶ 132.  The Amended

Complaint largely focuses on Michael's purported misconduct in connection with the Frankfurt Transaction, but it also asserts that Eddie and Boris's threatening phone calls to Davidoff and David's work creating the allegedly defamatory website were conducted in connection with MIT.

The Defendants argue that the Amended Complaint does not adequately allege an enterprise distinct from the individual defendants. They rely on *Bennett v. United Trust Co. of New York*, 770 F.2d 308 (2d Cir. 1985), which held that a corporate entity may not be simultaneously the "enterprise" and the "person" who conducts the affairs of the enterprise through a pattern of racketeering activity in claims under § 1962(c). 770 F.2d at 315. There, however, the Complaint treated the defendant United Trust Company as both the enterprise and the defendant person who conducted its affairs. Here, by contrast, the enterprise (MIT) is separate from the defendant Shamayevs, and it is only the individual defendants who are alleged to have used the MIT shop as "the hub for their racketeering activities." Am. Compl. ¶ 132. Corporate officers or employees may be charged with RICO in connection with a corporation of which they are a part. *Cedric Kushner Promotions*, 533 U.S. at 161. Plaintiffs have adequately pled this RICO element.

### 3. A Pattern of Racketeering Activity

The third element of a RICO claim is a "pattern" of racketeering activity. For such a pattern to exist, the acts of racketeering activity "must be related and continuous." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. A complaint that properly alleges either a closed- or open-ended pattern satisfies the continuity requirement of the pattern

element.  *See Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11 Civ. 7801 (PAE),

2012 WL 1231775, at *7 (S.D.N.Y. 2012) (citing *First Capital Asset Mgmt. v. Satinwood*, 385

F.3d 159, 181 (2d Cir. 2004)).

### a.  Open-Ended Continuity

An "open-ended pattern of continuity" exists where defendants' predicate acts represent

an ongoing way of conducting defendants' business.  *H.J.*, 492 U.S. at 243.  If the enterprise is

primarily legitimate, there "must be some evidence from which it may be inferred that the

predicate acts were the regular way of operating that business, or that the nature of the predicate

acts themselves implies a threat of continued criminal activity."  *DeFalco*, 244 F.3d at 323

(citing *Cofacredit*, 187 F.3d at 243); *see also H.J. Inc.*, 492 U.S. at 243; *GICC Capital Corp. v.

Tech Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995); *Azrielli*, 21 F.3d at 521.

The Amended Complaint concedes that MIT is a legitimate business, Am. Compl. ¶ 5,

and does not allege that MIT's predicate acts (fraudulent sales of watches, extortion, and money

laundering) were the *only* way the business operated.  *Cf. SKS Constructors Inc. v. Drinkwine*,

458 F. Supp. 2d 68, 80 (E.D.N.Y. 2006) (plaintiffs' allegation that predicate acts were only way

business operated sufficient to establish open-ended continuity for purpose of motion to dismiss).

To survive a motion to dismiss, the Amended Complaint must, therefore, adequately allege either

that Defendants' predicate acts were the *regular* way in which they operated their legitimate

business or that the nature of these acts themselves implies a threat of continued criminal

activity.  *DeFalco*, 244 F.3d at 323; *see also World Wrestling Entm't Inc. v. Jakks Pac., Inc.*, 530

F. Supp. 3d 486, 516 (S.D.N.Y. 2007) (plaintiffs' allegations that defendants' primary goal was

to defraud plaintiffs is not the same as saying defendants' alleged enterprise "normally did

business via racketeering").

The Second Circuit's decision in *Cofacredit*, 187 F.3d 229 (2d Cir. 1999), provides instructive guidance here.  There, the Second Circuit held that a district court had erred in finding open-ended continuity, despite proof that defendants had engaged in mail and wire fraud against the plaintiffs for more than a year.  The Second Circuit held that there was insufficient evidence to support a finding that the incidents of fraud were a regular means by which the *Cofacredit* defendants conducted their plumbing supply business.  *Id.* at 144.  Instead, the Second Circuit determined that the evidence showed a "discrete and relatively short-lived scheme to defraud a handful of victims through racketeering activity."  *Id.*

Even taking the Amended Complaint's allegations as true, it alleges insufficient facts on which one could find that mail and wire fraud are regular means by which MIT and its employees conduct their business.  The most that can be said of the Amended Complaint is that it alleges three, or perhaps, four instances in which MIT sold as new luxury watches items that were not so: the Tuleshov Transaction, the Frankfurt Transaction, and the Davidoff Transaction (which entailed two wire transfer payments for such watches).  But, as *Cofacredit* teaches, without more, four fraudulent transactions are an insufficient basis on which to assert that MIT's business model is based on selling fraudulent watches.

Plaintiffs attempt to bolster their claim by citing to six complaints about MIT by "real buyers," as recorded on an online review website, Citysearch.[3]  Am. Compl. ¶ 109.  But these reviews fall far short of corroborating a business model based on fraudulently holding out watches as new.  Two reviews claimed that MIT's employees acted aggressively or with "incredible rudeness"; a third claimed that working with MIT was a "horrible experience"; and a

---

[3] The Court here considers these materials as "written instrument[s] attached to [the Amended Complaint] as an exhibit," to which a Court may look on a motion to dismiss.  *Chambers*, 282 F.3d at 152–53.

fourth warned that MIT's employees generated the favorable reviews it had received on Citysearch.  These reviews have nothing to do with the allegation of fraudulently marketing high-end watches; if anything, the absence of such a grievance suggests that the unhappy reviewers did not experience fraud, but merely were treated rudely or badly.  The two remaining reviews do allege that MIT purported to sell new watches that were actually used—although both are anonymous in the Amended Complaint and recite their grievances in highly general terms; as such, they are entitled to very little weight, even in the context of a motion to dismiss.  All told, the Amended Complaint offers no more than six instances in which MIT, a business that has been operating out of New York City for eight years, has purportedly defrauded its customers into buying used watches on the premise that they were new.

These sparse allegations, of fewer than one act of fraud per year, are insufficient to make out a claim of racketeering based on a theory that such fraud was the Shamayevs' regular way of conducting their business.  The Court has a duty to critically assess RICO claims at the threshold, to assure that a plaintiff's claim of a RICO violation is not used improperly as a club to bludgeon settlement or surrender without reciting legally sufficient allegations.  "Because the 'mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'"  *Allen v. New World Coffee, Inc.*, No. 00 Civ. 2610 (AGS), 2001 WL 293683, at *3 (S.D.N.Y. Mar. 27, 2001) (quoting *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y.1998)).

As noted, a plaintiff can alternatively state a claim of open-ended continuity if the nature of the predicate acts themselves implies a threat of continued criminal activity.  *DeFalco*, 244 F.3d at 323.  Applying this standard, the Second Circuit has noted that where the acts of a

defendant or enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, courts have generally held that the nature of the activity itself established the threat of continuity, even though the racketeering acts occurred over a short time period. *United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995). By contrast, where the alleged racketeering activity was in connection with businesses or endeavors that are not inherently unlawful, such as fraudulent acts in connection with the sale of property, courts generally have not found a threat of continuing criminal activity arising from the nature of the conduct alone, even if it extended over even longer periods. *Id.*

Measured against this standard, MIT's alleged fraudulent practices in the marketing of luxury watches do not imply a threat of continuing criminal activity over time. The facts alleged are akin to those cases involving alleged illegal conduct in the sale of property. As noted, such allegations have generally not been held to imply a threat of continuing criminal activity. *See Aulicino*, 44 F.3d at 1111 (nature of activity itself provides requisite threat of continuity in the case of "inherently unlawful" acts such as murder or obstruction of justice, in pursuit of "inherently unlawful goals" such as narcotics trafficking or embezzlement, but "in cases concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property, the courts generally have found no threat of continuing criminal activity arising from conduct that extended over even longer periods"); *F.D. Prop. Holdings Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362, 371 (E.D.N.Y. 2002) (a onetime allegedly false statement under a negotiated letter of credit is not inherently unlawful); *Econ. Opportunity Comm'n v. Cnty. of Nassau*, 47 F. Supp. 2d 353, 366–67 (E.D.N.Y. 1999) (alleged mail fraud, wire fraud and Hobbs Act predicates are not inherently unlawful); *Skylon Corp. v.*

*Guilford Mills, Inc.*, No. 93 Civ. 5581 (LAP), 1997 WL 88894, at *6 (S.D.N.Y. Mar. 3, 1997) (plaintiff's allegations of verbal and written misrepresentations made over the telephone and in letters are not inherently unlawful, but rather "run-of-the-mill fraud"); *Pier Connection, Inc. v. Lakhani*, 907 F. Supp. 72, 76 (S.D.N.Y. 1995) (open-ended continuity element not satisfied where plaintiff alleged no facts that would allow the Court to infer more than a "single fraudulent scheme"); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 792 F. Supp. 244, 264 (S.D.N.Y. 1992) (fraudulent sale by a company of its wholly-owned subsidiary, involving alleged violation of securities laws and multiple defendants, characterized as a "one-shot, non-recurring deal" and does not establish open-ended continuity).

Nor is this a situation where, despite an absence of inherently unlawful activity, "other kinds of external facts . . . provide evidence of the requisite threat of continuity." *U.S. v. Kaplan*, 886 F.2d 536, 542–43 (2d Cir. 1989). *Kaplan* looked to *Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir. 1989) (en banc), *vacated for further consideration*, 492 U.S. 914 (1989), *upheld by* 893 F.2d 1433 (2d Cir. 1989), for guidance. In *Beauford*, a civil RICO case, the court held a onetime mailing of 8,000 fraudulent documents in connection with the conversion of an apartment complex into condominiums sufficient to infer the existence of the threat that similar mailings would be made in the future. *Id.* at 1392. In finding the RICO pattern element satisfied, the court stated the nature of this onetime mailing could not "be deemed, as a matter of law, isolated or sporadic." *Id.* Similarly, in *Kaplan*, the court held that the nature of the enterprise, particularly the defendant's "demonstrated willingness to facilitate corruption generally," was sufficient to find a threat of continued activity, and "avoid the danger of the application of RICO to perpetrators of isolated or sporadic criminal acts." *Kaplan*, 886 F.2d at 543 (quoting *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989)).

No such conclusion is warranted here, given the intermittent nature of the fraudulent episodes alleged relative to MIT's eight years of existence.  Plaintiffs' garbled allegations that "the watches offered through e-mails were not what for real [*sic*], either being not new, or defective, or after repairs, or simply unavailable when an order would be placed, whereas immediately alternative items would be offered instead," Am. Compl. ¶ 38, fall far short of providing any evidence threatening continuity.  The alleged acts portray at most "isolated or sporadic" fraudulent conduct in the context of the sale of property—acts which, if true, were condemnable, but which do not constitute the "long-term criminal conduct" Congress had in mind in enacting the RICO statute.[4]  *Aulicino*, 44 F.3d at 1110–11.

It is a different, and more difficult, question whether the coercive conduct (alternately characterized as witness tampering and extortion[5]) by the Shamayevs towards the Plaintiffs alleged in the Amended Complaint implies a threat of continuing criminal activity.  18 U.S.C. Section 1512(a)(2) ("Tampering with a witness, victim, or an informant") applies to "[w]ho[m]ever uses physical force or the threat of physical force against any person, or attempts

---

[4] The same is true of Plaintiffs' claims, as predicate acts, under § 1956(a)(2) (transporting money into the United States knowing that such money represents the proceeds of unlawful activity), and §1957 ("Engaging in monetary transactions in property derived from specified unlawful activity").  *See* Am. Compl. ¶ 114.  Plaintiffs only allege one instance—insufficient to plead continuity—of the former violation, and none of the latter; the latter allegation appears to be based on the assumption that Defendants in some unspecified way utilized the proceeds of the money illegally obtained from Plaintiffs.  *See* Am. Compl. ¶ 119 ("Subject to . . . an opportunity to subpoena to [*sic*] Bank of America, to disclose MIT's account records at the relevant time in January of 2012, Plaintiffs will be able to show MIT's and Shamayevs' transactions dispensing with the $120,000.").  In other words, Plaintiffs seek permission to embark on a fishing expedition that will confirm an otherwise unsupported claim that their funds were later utilized by MIT in further transactions.  The pleading standards articulated in *Twombly* and *Iqbal* do not countenance such expeditions.

[5] Plaintiffs also appear to allege a violation of 18 U.S.C. § 1958 ("Use of interstate commerce facilities in the commission of murder-for-hire") as a predicate act.  But that allegation lacks support in the Amended Complaint, which alleges only *threats* to contract for murder.  Even under a liberal review of Plaintiffs' pleadings, that predicate act is insufficiently pled.

to do so, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense . . . ."  18 U.S.C. § 1512(a)(2)(C).  The Amended Complaint alleges that Eddie, MIT's principal and founder, called Davidoff in Germany in the late hours of June 14, 2012, threatening to "contract" Davidoff's murder as well as cause physical harm to members of Davidoff's family, "unless Davidoff gave up."  Am. Compl. ¶¶ 8, 83–86, 122.  The Amended Complaint also alleges, less specifically, that Boris and Michael made similar phone calls to Davidoff, *id.* ¶ 123, all to induce "a forced decision to abandon [] lawful claims for the return of the moneys paid to the Shamayevs and MIT," *id.* at ¶ 124.[6]  According to the Amended Complaint:  "At the time Shamayevs [*sic*] were making threats to Davidoff, he had already indicated that he was going to file claims in the court in the U.S.  Davidoff also made clear his intention to report the Shamayevs' frauds to the law enforcement in the U.S. for initiating the [*sic*] criminal case.  By virtue of the complaints to be initiated in the United States, Davidoff should have been considered as a witness in the forthcoming U.S. proceedings."  Am. Compl. ¶ 127.  The plaintiffs correctly point out that an official proceeding does not need to be pending for this statute to apply.  18 U.S.C. § 1512(f)(1); *see also U.S. v. Gonzalez*, 922 F.2d 1044, 1055 (2d Cir. 1991) ("Congress explicitly overruled case law requiring that an official proceeding be pending in order for a defendant to be subject to prosecution of witness tampering."); *U.S. v. Boyle*, No. S1 08 Cr 534 (CM), 2009 WL 2032105, at *6 (S.D.N.Y. 2009) ("[I]t is settled that an official proceeding need not be pending or about to be instituted at the time of the offense.").  However, the statute contemplates at least an investigation or another kind of legal process that

---

[6] In the motion to supplement, Plaintiffs propose to add the claim that one of the Shamayevs, or an agent of theirs, called and threatened Davidoff at least nine different times.  Davidoff Decl. ¶¶ 4–11.

would plausibly arise and cause a witness to be summoned; there must be a "nexus" between the actions alleged and the legal process or proceeding contemplated.  *See Arthur Andersen LLP v. U.S.*, 544 U.S. 696, 707–08 (2005); *United States v. Quattrone*, 441 F.3d 153, 180–81 (2d Cir. 2006).

The Amended Complaint appears to suggest that Davidoff was a potential witness because Defendants knew he was going to file a lawsuit in the United States.  Am Compl. ¶¶ 127–128.  Such allegations put the proverbial cart before the horse.  Plaintiffs do not provide any indication, beyond wholly conclusory claims, that Defendants made the threats in contemplation of an actual future court proceeding, rather than as generalized threats to intimidate Plaintiffs, which would not constitute witness tampering.  Therefore, it is unlikely that Section 1512 should apply in this context.

Even giving Plaintiffs the benefit of the doubt, however, and construing the allegation of witness tampering as a predicate act, Defendants' alleged instances of witness tampering do not imply a continued threat of racketeering activity under Second Circuit case law.[7]

The Second Circuit's decisions in *Cofacredit*, *GICC Capital Corp.*, and *DeFalco* help frame this analysis.  In *Cofacredit*, the Second Circuit held that that the Complaint's allegations did not imply a threat of ongoing racketeering activity, because the nature of the Windsor defendants' scheme to obtain cost-free inventory was "inherently terminable."  *Cofacredit*, 187 F.3d at 244.  Those defendants had reached the limit of their $1.5 million insurance policy for unpaid invoices, and therefore no longer could use their scheme to obtain cost-free inventory.  *Id.*

---

[7] An identical analysis applies to Plaintiffs' claim under 18 U.S.C. § 1513 ("Retaliating against a witness, victim, or informant").  It is questionable that that claim, too, is properly pled, as there is no clear allegation that a future proceeding was contemplated at the pertinent time.  But even if it were, that claim also fails to satisfy open-ended continuity, for the same reasons discussed in connection with the claim of witness tampering.

at 238.  Similarly, in *GICC Capital Corp.*, the Second Circuit held that, where the defendants'
scheme was designed to deprive the plaintiff corporation of its assets, there was no longer a
threat of ongoing racketeering activity once there were no more assets to loot.  67 F.3d. at 467.
In contrast, in *DeFalco*, the Second Circuit found a threat of continued criminal activity, where
the defendants threatened that, if the plaintiff did not comply with their demands, they would use
their administrative power to block the plaintiff's development project, and indeed threatened to
continue to escalate their demands towards the plaintiff *even if he met their demands*.  *DeFalco,*
244 F.3d at 323–24.  Thus, the Court held, the *DeFalco* defendants "had no intention of stopping
once they met some immediate goal," and a reasonable jury could conclude that the defendants
would continue extorting plaintiffs into the future.  Therefore, the scheme was not "inherently
terminable."  *Id.* at 324.

Applying this line of doctrine to the allegations here, the Defendants' claim that these
allegations are defective carries the day.  At bottom, Plaintiffs allege, Plaintiffs claimed refunds
from the Frankfurt and Davidoff Transactions, and the Defendants responded by threatening to
harm Davidoff and his family unless they abandoned the pursuit of those refunds.  Am. Compl.
¶¶ 123–28.  It does not follow, however, that such extortionate conduct would continue
indefinitely.  Rather, the logical conclusion of Plaintiffs' claims is that, had Kalimantano and
Davidoff capitulated, Defendants would have ceased their threats of harm.  The Amended
Complaint supplies no reason to assume that such threats would have outlasted any such
capitulation.  *See DeFalco*, 244 F.3d at 324.  Plaintiffs repeated refrain, throughout the Amended
Complaint, that MIT's activities were done "with [] open-ended continuity," *see, e.g.*, Am.
Compl. ¶¶ 2, 5, 8, 136, does not make it so.

This case is therefore in pointed contrast to *DeFalco*, where, as noted, there was every possibility of a long-term scheme in which the defendants extorted money and employment from the plaintiff, who was vulnerable to their demands.  The same is not true here—there is no allegation based on which one can infer likely or inevitable continuing business dealings between the Plaintiffs and the Defendants, or continuing leverage of the Defendants over the Plaintiffs, beyond the scope of this lawsuit.

Other facts diminish the realistic likelihood of continuing racketeering activity of this nature.  The threats alleged by the Amended Complaint were cabined in time:  they allegedly occurred during a four-month period, and ended with a threat, made during a phone call initiated by Davidoff, on October 4, 2012.  Davidoff Decl. ¶¶ 4–11.  But the Amended Complaint does not allege any additional threats between then and January 11, 2013, when Plaintiffs filed the motion to supplement.  Also notably, (1) the Defendants who purportedly threatened Davidoff and his family were in New York City, some 3,800 miles away from Davidoff and his family, in Frankfurt, Germany; and (2) with the exception of the first alleged phone call, by Eddie on June 14, 2012, all later phone calls were made by unknown individuals claiming either to represent the Shamayevs, or simply telling Davidoff to drop the lawsuit.  Davidoff Decl. ¶¶ 4, 6, 8, 10, 11. Without more, the Amended Complaint simply does not allege enough information on which the Court could infer a realistic threat of continuing criminal activity.  *See Lefkowitz v. Bank of N.Y.*, No. 01 Civ. 6252 (VM), 2003 WL 22480049, at *9 (S.D.N.Y. Oct. 31, 2003), *rev'd in part on other grounds*, 528 F.3d 102 (2d Cir. 2007) (no indication that defendants would continue their alleged scheme once the probate proceedings were completed, therefore no open-ended continuity); *D.R.S. Trading Co., Inc. v. Fisher*, No. 01 Civ. 8028 (WHP), 2002 WL 1482764, at *4 (S.D.N.Y. July 10, 2002) (discrete fraudulent scheme committed for period of five months

with a "limited number of perpetrators, small number of victims and limited goal . . . cannot support claim of open-ended or closed-ended continuity"); *First Capital Asset Mgmt., Inc. v Bricklebrush, Inc.*, 150 F. Supp. 2d 624, 633 (S.D.N.Y. 2001) (scheme to commit bankruptcy fraud necessarily ended with bankruptcy); *Price v. Gast*, No. 98 Civ. 7789 (LBS), 2000 WL 369381, at *9 (S.D.N.Y. Apr. 11, 2000) (alleged fraudulent scheme considered "short-lived and inherently terminable" because it had one narrow purpose that was ultimately achieved, and therefore did not pose a threat of continued criminal activity); *Cucina Clasica Italiana, Inc. v. Banca Nazionale Del Lavoro*, No. 96 Civ. 1144 (JFK), 1997 WL 2516, at *7 (S.D.N.Y. Jan. 3, 1997) (two-month scheme to induce plaintiff to assume and provide security for debt of a third party to the Banks and pay the Banks' attorneys' fees was too short-lived, inherently terminable, and had too few victims to show threat of continuity); *China Trust Bank of N.Y. v. Standard Chartered Bank, PLC*, 981 F. Supp. 282, 287 (S.D.N.Y. 1997) (alleged scheme to get plaintiff to assume liability on a third party's account was inherently terminable).  Consequently, none of the predicate acts Plaintiffs allege, viewed alone or in combination, satisfies the open-ended continuity requirement of the RICO statute.  Such allegations, if true, may constitute violations of criminal statutes; they are not, however, sufficiently open-ended to support such a RICO claim.

### b.  Closed-Ended Continuity

Although the Amended Complaint does not expressly mention closed-ended continuity, the Amended Complaint and Plaintiffs' motion to supplement and request for judicial notice suggest an attempt to satisfy that standard.  The principles governing a claim of this nature are familiar.  *See Nightingale Group, LLC v. CW Capital Mgmt., LLC*, No. 11 Civ. 9293 (PAE), 2012 WL 2674539, at *6–8 (S.D.N.Y. July 5, 2012); *Continental Petroleum Corp., Inc. v. Corp.*

24

*Funding Partners, LLC*, No. 11 Civ. 7801 (PAE), 2012 WL 1231775, at *7 (S.D.N.Y. Apr. 12, 2012). "[C]losed-ended continuity is primarily a temporal concept," *DeFalco*, 244 F.3d at 321, and the Second Circuit has never held a period of racketeering activity lasting less than two years to be substantial enough to qualify as closed-ended continuity. *Id.*; *see also Cofacredit*, 187 F.3d at 242; *GICC Capital Corp.*, 67 F.3d at 467. Moreover, "while two years may be the minimum duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004). "[O]ther factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are relevant in determining whether closed-ended continuity exists." *Id.* (citing *Cofacredit*, 187 F.2d at 242; *GICC Capital Corp.*, 67 F.3d at 468). The Court accordingly looks first to the Amended Complaint's allegations as to the duration spanned by Defendants' acts of racketeering, and then considers the other relevant factors.

### i.    Duration

The predicate acts the defendants are alleged to have committed define the duration of the period of racketeering activity. *H.J. Inc.*, 492 U.S. at 242. Under the most liberal reading of the Amended Complaint, the RICO conspiracy began when Davidoff first received fraudulent emails from MIT at some point in 2009, and concluded with the last threatening phone call to Davidoff from an unidentified agent of the Shamayevs on October 4, 2012. *See* Davidoff Decl. ¶ 11. Although these allegations nominally are consistent with a period of just short of four years (assuming the first email was sent January 1, 2009) or just under three years (assuming it was sent on December 31, 2009), the allegations as to the 2009 emails are too blurry and inexact to qualify as RICO predicates. Allegations of predicate acts sounding in fraud, including claims of

mail or wire fraud, must be pled with the heightened pleading requirements of Federal Rule of

Civil Procedure 9(b). *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184–85 (2d

Cir. 2008). "Allegations of predicate mail and wire fraud acts should state the contents of the

communications, who was involved and where and when they took place, and should explain

why they were fraudulent." *Id.* (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d

Cir. 1993)). Here, the Amended Complaint avers that "the watches offered through e-mails were

not . . . real, either being not new, or defective, or after repairs, or simply unavailable when an

order would be placed, whereas immediately alternative items would be offered instead." Am.

Compl. ¶ 38. But Plaintiffs do not quote the emails, do not provide their dates, and do not set out

any specifics as to their content besides the allegation that they contained promotional messages

like "Blowout Price!!!!" and offered "unusual discounts" on numerous luxury watch brands. *Id.*

¶¶ 36, 38. Nor do Plaintiffs allege facts demonstrating that Defendants harbored a fraudulent

intent at the time they sent those emails, which were sent years before the watch transactions in

which they engaged. *See Mills*, 12 F.3d at 1176 (fact that a company's president registered

shares for two managers and not for a third, after agreeing to register that manager's shares, does

not sufficiently allege president's fraudulent intent not to register shares *at the time of the

agreement* four months earlier); *see also Spool*, 520 F.3d at 185 (plaintiffs insufficiently pled

predicate acts of wire and mail fraud because amended complaint failed to allege specific

fraudulent communications about foreign program fees for adoptions and only alleges two

individuals actually paid the fraudulent fees). Instead, the Amended Complaint alleges vaguely

that Davidoff generally recalls emails sent to him by MIT between 2009 and December 2011 that

allegedly set in motion the Frankfurt Transaction. Am. Compl. ¶¶ 39, 40. These pleadings are

not nearly concrete enough to set 2009 as the start date for the alleged racketeering scheme.

Once the hazy allegations as to emails in 2009 are stripped away, the first racketeering acts are those involved in the Tuleshov Transaction, which, as alleged, took place on unidentified dates "in about October and November 2010." Am. Compl. ¶ 31.  The Amended Complaint does not attach specific dates to these events, and particularly because the Tuleshov events sound in fraud and are subject to the heightened pleading standards of Rule 9(b), the Court would be straining to assume that the Tuleshov scheme commenced on October 1, 2010.  And the span from any date after October 4, 2010, until the October 4, 2012 phone call from an anonymous caller to Davidoff would fall just below the two-year minimum time frame that the case law demands.  Under either reading, the time frame properly considered is certainly no greater than two years.  Plaintiffs therefore are unlikely to satisfy the duration requirement of a pattern of racketeering activity.

### ii. Discrete Scheme with Limited Number of Victims

Even if Kalimantano's Amended Complaint had alleged a scheme beginning on October 1, 2010—three days longer than the two-year minimum requirement—it would still fall short of adequately alleging closed-ended continuity.  *See DeFalco*, 244 F.2d at 321.  As a court in this District has aptly summarized, "courts in this Circuit have held repeatedly that allegations of RICO violations involving solely mail and wire fraud or little other variety in the predicate acts, a limited number of participants or victims, a discrete scheme with a narrow purpose or a single property—as opposed to complex, multi-faceted schemes—are generally insufficient to demonstrate closed-ended continuity."  *Gross v. Waywell*, 628 F. Supp. 2d 475, 494–96 (S.D.N.Y. 2009) (even though defendants' scheme lasted more than four years and plaintiffs alleged more than 100 instances of mail and wire fraud, the scheme as a whole had a single goal to the benefit of a limited number of defendants); *see also Medinol Ltd. v. Bos. Scientific Corp.*,

27

346 F. Supp. 2d 575, 616 (S.D.N.Y. 2004) (scheme with three participants, one purpose and one victim too narrow to be a pattern of racketeering activity); *Lefkowitz v. Bank of N.Y.*, No. 01 Civ. 6252 (VM) 2003 WL 22480049, at *9 (S.D.N.Y. Oct. 31, 2003) (RICO claim insufficient because allegations amounted to nothing more than a "small number of parties engaged in activities with a narrow purpose directed at a single or at most three victims); *Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 257 (S.D.N.Y. 2002) (a scheme of four acts of mail fraud committed by one person against a small number of victims in a single fraudulent scheme was too narrow and discrete to satisfy closed-ended continuity).

Here, the Amended Complaint alleges, at most, schemes aimed to defraud two sets of three or fewer victims each (those in the Tuleshov and Frankfurt and Davidoff Transactions). Although Plaintiffs package these schemes as entailing "over 10 instances of wire and mail fraud," Am. Compl. ¶ 111**,** these allegations, viewed in real terms, reduce to claims of several instances in which watches were sold on false or misleading pretenses.  Such allegations do not come close to describing a fraudulent scheme of sufficient breadth or reach to meet the pattern requirement.  Nor does adding onto these schemes the thinly alleged claim that Defendants laundered the money received for these watches, or the claim that Defendants sought to quell the same victims from pursuing lawful avenues of relief.  Viewed against the body of RICO case law in this District, Plaintiffs' allegations of a scheme involving a small number of victims and participants and spanning a limited time frame do not satisfy the requirement of closed-ended continuity.

Accordingly, the Amended Complaint fails to satisfy either open-ended or closed-ended continuity, even when considered in conjunction with Plaintiffs' proposed supplemental pleadings.  The motion to dismiss Plaintiffs' civil RICO claim is therefore granted, and

Plaintiffs' motion to supplement the pleadings pursuant to Rule 15(d), which Plaintiffs concede is "most relevant for [the] cause of action under R[ICO]," Kalimantano Cross-Motion Br. 6, is denied as futile.

### B.  Diversity Jurisdiction

Notwithstanding the dismissal of the RICO claim, Plaintiffs have satisfactorily pled a separate basis for federal jurisdiction:  diversity jurisdiction under 28 U.S.C. § 1332.  Plaintiffs have pled that all four individual plaintiffs and Kalimantano GmbH are either citizens in, residents of, or incorporated in the Federal Republic of Germany; and that all four individual defendants and Motion in Time, Inc. are citizens in, residents of, or incorporated in the State of New York.  Am. Compl. ¶¶ 12, 13; *see* 28 U.S.C. §1332(a)(2).  Plaintiffs have also adequately pled that the amount in controversy exceeds $75,000.  The Court accordingly considers the adequacy of Plaintiffs' pleading as to the 11 state-law causes of action.

### C.  Plaintiffs' State Law Claims

#### 1.  Breach of Contract

A complaint for breach of contract under New York law need allege only: "(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  The Amended Complaint alleges that plaintiffs entered into four "attempted contracts" with MIT: those involving: (1) the $65,000 Blancpain Tourbillon watch; (2) the €135,000 Patek Philippe watch; (3) the second Patek Philippe watch in the Davidoff Transaction, for which there was to be a $70,000 down payment; and (4) a set of 500 Audemars Piguet watches in the Davidoff Transaction, for which there was to be a $50,000 down payment.  Am. Compl. ¶ 140.

The Amended Complaint's pleading as to the first element, the existence of a contract, may charitably be described as garbled.  The Amended Complaint casts the cause of action as "breach of contract."  Am. Compl. ¶¶ 138–142.  It then, however, proceeds to refer to these four transactions as "attempted contracts," and states that "none of the attempted contracts resulted from the 'meeting of the minds' of the parties," *Id.* ¶ 141—a foundational element of contract formation.  *See Schurr v. Austin Galleries, Inc.*, 719 F.2d 571, 576 (2d Cir. 1983) ("Under New York contract law, the fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties."  (citations omitted)).  Reading the Amended Complaint as a whole, however, the Court concludes that the Amended Complaint fairly alleges an oral agreement among the parties, albeit one which, Plaintiffs allege, defendants never intended to perform.  When questioned about their garbled pleadings at argument, Plaintiffs confirmed this reading.[8]

---

[8]     THE COURT: You have a cause of action called breach of contract, but in the cause of action you say there was no contract. . . . Was there a binding contract?
MR. LAMBERT: Yes, your Honor.
THE COURT: How could there be a binding contract without a meeting of the minds?
MR. LAMBERT:  What plaintiffs attempted to state was that defendants didn't have the intention to carry out the contracts . . .
THE COURT: But if I offer to sell you a car for $5,000 and you say I will buy it for $5,000 and we write it down like that, even if I didn't privately intend to sell you the car, you could sue me to get the car for $5,000, could you not?
MR. LAMBERT: Certainly.
THE COURT: So is it a defense to a breach of contract action that from the defendants' point of view I never intended to perform?
MR. LAMBERT: Well, it is not a defense because the state of mind of defendants that was unknown to the plaintiffs at the time.  They had a contract, but as it turned out, the defendants had the state of mind to defraud my client, but that was definitely fraudulent.
THE COURT: So what you are telling me is, notwithstanding the incoherent way in which the breach of contract claim is framed, what you intended to do was say here that the parties expressed words of binding intentions, but the defendants never intended to perform, is that correct?
MR. LAMBERT: Exactly.

Tr. 14–15.

The Court, while admonishing plaintiffs' counsel to draft subsequent submissions in this case with a higher level of coherence, therefore finds that element satisfied.

As to the second, third, and fourth elements, Plaintiffs allege that they, or their assignors, paid four sums—$65,000, €135,000, $70,000, and $50,000—in connection with the Tuleshov, Frankfurt, and Davidoff Transactions—and that Defendants either delivered used watches in place of new watches, or failed to deliver any watches at all.  Am. Compl. ¶¶ 33, 73, 74, 140. The Amended Complaint adequately alleges that Plaintiffs performed their obligations under the contracts, that Defendants breached the contract, and that Plaintiffs suffered damages.

Plaintiffs have adequately alleged a breach of contract by MIT.  The Court denies MIT's motion to dismiss as to that claim.

### 2.   Conversion, Money Had and Received, and Fraudulent Misrepresentation

Under New York law, damages that arise from the failure of a party to perform pursuant to a bargained-for agreement are recoverable in contract, and not in tort, unless a legal duty independent of the contract itself has been violated.  *See Bellevue South Assocs. v. HRH Const. Corp.*, 78 N.Y.2d 282, 294–95 (1991); *see also Carmania Corp. N.V. v. Hambrecht Terrell Int'l*, 705 F. Supp. 936, 938 (S.D.N.Y. 1989) ("New York law . . . [restricts] plaintiffs who have suffered 'economic loss' but not personal or property injury to an action for the benefits of their bargains.  If the damages suffered are of the type remediable in contract, a plaintiff may not recover in tort.").  This "economic loss" rule has implications for several of Plaintiffs' causes of action.

### a.   Conversion

Plaintiffs' claim for conversion is not qualitatively different from its breach of contract claim.  *See Richbell Info. Servs. Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 590 (1st Dep't.

2003).  A conversion claim must be dismissed when it does not stem from a wrong independent of the alleged breach of contract.  *See Wolf v. Nat'l Council of Young Israel*, 694 N.Y.S.2d 424, 425 (2d Dep't. 1999) ("[A] claim to recover damages for conversion cannot be predicated on a mere breach of contract.").  Here, the conversion claim rests on the allegation that Defendants "dishonored their obligation to return the cash . . . for the merchandise that was received for the faulty item" and "delivered the defective [Patek Philippe watch in the Frankfurt Transaction] . . . knowing that it was not a new item."  Am. Compl. ¶¶ 144–145.  That claim does no more than recite a breach of contract.  Plaintiffs' claim for conversion is therefore dismissed.

### b.  Money Had and Received

A claim for money had and received is similarly precluded where there is an express contract between the parties addressing the same subject matter.  *Parsa v. State*, 64 N.Y.2d 143, 148 (1984).  However, where a contract is not found, a plaintiff may obtain relief in quasi-contract.  *Hoyle v. Dimond*, 612 F. Supp. 2d 225, 231 (W.D.N.Y. 2009) ("Although the existence of a valid and enforceable contract governing a particular subject matter generally precludes recovery in quasi contract, where there is a bona fide dispute as to the existence of a contract or the application of a contract in the dispute in issue, a plaintiff may proceed upon a theory of quasi contract as well as breach of contract, and will not be required to elect his or her remedies. Here, the plaintiff may properly plead unjust enrichment and money had and received as he has not pled a claim for breach of contract. Even if plaintiff had pled a contract claim, the unjust enrichment and money had and received claims could be alternative claims to a breach of contract claim." (citations omitted)).  At this early stage, it has not been determined whether Plaintiffs' breach of contract claim will ultimately succeed, so as to preclude recovery for money

had and received.  Plaintiffs' claim for money had and received therefore survives the motion to dismiss.

### c.  Fraudulent Misrepresentation

In this claim, the Amended Complaint alleges that the Shamayevs, acting for MIT, made misrepresentations to the buyers in the Tuleshov, Frankfurt, and Davidoff Transactions.  Am. Compl. ¶¶ 177–178, 180.  For this claim to survive, Plaintiffs must allege an injury beyond economic loss.  *See Orlando v. Nouvrania of Am., Inc.*, 162 F. Supp. 2d 220, 226 (S.D.N.Y. 2001) (dismissing a claim for fraudulent misrepresentation under the economic loss rule when the only loss alleged was the price plaintiff paid for the item under the contract).  Here, the Amended Complaint alleges that (1) but for Michael's misrepresentations, Davidoff, Felde and the Kazahkstan partners never would have entered into an agreement to purchase a watch, and MIT never would have received €135,000, Am. Compl. ¶ 178; and (2) but for Defendants' later misrepresentations to Davidoff, Davidoff never would have made the $50,000 and $70,000 down payments for the watches in the Davidoff Transactions, *id.* at ¶ 180.  Notwithstanding Kalimantano's unadorned demand for "punitive and exemplary damages," this claim at root seeks only the return of the moneys Plaintiffs paid under their oral agreements to purchase watches.  Under the economic loss rule, the fraudulent misrepresentation claim must also be dismissed.

### 3.  Fraudulent Conveyances

Under New York Debtor and Creditor Law § 276, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  N.Y. Debt. & Cred. Law § 276.  Only a creditor of a transferor can bring a

fraudulent conveyance claim. *Eberhard v. Marcu*, 530 F.3d 122, 129 (2d Cir. 2008). Section

270 of the New York Debtor and Creditor law, in turn, defines a "creditor" as a "person having a

claim, whether matured or unmatured, liquidated or unliquidated, absolute fixed or contingent."

N.Y. Debt. & Cred. Law § 270. Fraudulent conveyance claims must be pled with particularity

sufficient to satisfy Rule 9(b). *Id.* at 341–42; *see also Royal Palm Senior Investors, LLC v.*

*Carbon Capital II, Inc.*, No. 08 Civ. 4319 (BSJ), 2009 WL 1941862, at *6 (S.D.N.Y. July 7,

2009).

The Amended Complaint fails these standards. It alleges that "the wires for $70,000 and

$50,000, for the total of $120,000, as advance payment for the watches, in fact represented a

credit, because no merchandise was received at the moment. Those transactions also constituted

a fraudulent conveyances [*sic*] on that [*sic*] part of Defendants." Am. Compl. ¶ 157. But the

Amended Complaint fails to identify any conveyance of these funds by Defendants. Plaintiffs do

not allege MIT did anything with the $120,000 other than keep it and fail to provide the watches

that Plaintiffs bargained for. In effect, the Amended Complaint repackages the breach of

contract claim as a breach of the Debtor and Creditor law, but without pleading its required

elements. The claim for fraudulent conveyances must be dismissed.

### 4. Fraud

Plaintiffs allege that Defendants' acts also constituted fraud. According to them,

Defendants: (1) misrepresented or omitted material facts; (2) which they knew to be false;

(3) with the intent to induce reliance by Plaintiffs; and (4) Plaintiffs reasonably relied on those

statements and (5) suffered injury as a result. Am. Compl. ¶ 162. However, "[t]o maintain a

claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate

from the duty to perform under the contract, or (ii) demonstrate a fraudulent misrepresentation

collateral or extraneous to the contract, or (iii) seek special damages that are caused by misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) (citations omitted); *see also GS Equities, Ltd. v. Blair Ryan Co.*, No. 08 Civ. 1581 (CM), 2011 WL 3278909, at *6 (S.D.N.Y. July 26, 2011) ("Breaching a contract does not constitute fraud unless some legal duty to the plaintiff that is independent of the contract is violated.  Any such independent duty must spring from circumstances extraneous to, and not constituting, elements of the contract itself.").

The Amended Complaint fails to do so here.  It neither alleges a legal duty separate from the duty to perform nor a fraudulent misrepresentation collateral or extraneous to the contract. Instead, what Plaintiffs describe as fraud is identical to the alleged breach of contract— Defendants, they allege, contracted to provide Plaintiffs with watches in a certain condition, never intending to do so; by delivering watches that did not meet that standard, Defendants breached the contract.  Although Plaintiffs claim that "Michael and other Defendants were under the obligation to disclose to Plaintiffs that the watch delivered by Michael was not new and was defective and that there was no proper certification of Patek Philippe . . . for that item," Am. Compl. ¶ 170, such an "obligation" arose from the *contract itself* rather than from any extraneous source.  And again, other than a conclusory demand for "punitive and exemplary damages," Plaintiffs fail to allege any "special damages" incurred from Defendants' actions other than those captured by the contract claim.  *See Vista Co. v. Columbia Pictures Indus., Inc.*, 725 F. Supp. 1286, 1294 (S.D.N.Y. 1989) (dismissing fraud claim where "plaintiffs allege no monetary damages or adverse consequences flowing from the alleged fraud which are not encompassed within the contract claim itself").  Consequently, Plaintiffs' fraud claim must be dismissed.

### 5.   Civil Conspiracy

The Amended Complaint alleges that the Defendants conspired to obtain Plaintiffs' and third parties' funds.  Am. Compl. ¶ 184.  But "a mere conspiracy to commit a [tort] is never of itself a cause of action."  *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986) (quoting *Brackett v. Griswold*, 112 N.Y. 454, 467 (1889)).  Rather, "allegations of conspiracy are permitted only to show that the tortious acts flowed from a common scheme or plan and to connect each defendant with an actionable injury. . . . The gravamen of the conspiracy action is the underlying wrong and the injury that results to plaintiff from it." *Danahy v. Meese*, 446 N.Y.S.2d 611, 614 (1981) (internal citations omitted); *see also Grove Press, Inc. v. Angleton*, 649 F.2d 121, 123 (2d Cir. 1981) ("The allegation is merely the string whereby the plaintiffs seeks to tie together those who, acting in concert, may be held responsible in damages for any overt act or acts." (citing *Rutkin v. Reinfeld*, 229 F.2d 248, 252 (2d Cir. 1954))).  Here, the Amended Complaint does not allege an independent tort.  Instead, it appears to use a claim of civil conspiracy as a vehicle to bring claims against Eddie, Boris, and David Shamayev, who are not alleged to have participated in the Frankfurt, Davidoff or Tuleshov Transactions.  And since the RICO claims do not survive Defendants' motion to dismiss, no conspiracy to violate the RICO statute can remain.  The civil conspiracy claim must, therefore, be dismissed.

### 6.   Unjust Enrichment

The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in unjust enrichment for claims arising out of the same subject matter.  *Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388 (1987).  Under New York law, recovery under the theory of unjust enrichment is available only in the absence

of an enforceable agreement. *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). As with the claim for money had and received, it is indeterminate at this early stage whether an enforceable agreement, or its breach, will be found. Accordingly, the claim for unjust enrichment survives, but solely as a potential alternative cause of action should Plaintiffs' contract claim fail. *See Baker v. Robert I. Lappin Charitable Found.*, 415 F. Supp. 2d 473, 485 (S.D.N.Y. 2006).

### 7. Defamation

"Under New York law, a plaintiff must establish five elements to recover in libel: (1) a written defamatory statement concerning the plaintiff; 2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or per se actionability (defamatory on its face)." *Celle v. Fillipino Reporter Enters., Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).

The Amended Complaint's defamation claim is based on three allegedly defamatory statements or sets of statements. First, it alleges, Defendants created and published a website at www.tofikdavidoff.com which falsely calls Davidoff "A Man You Can't Trust" and falsely accuses him of stealing the Patek Phillipe watch from the Frankfurt Transaction. Am. Compl. ¶¶ 93, 200, 202. Second, it alleges, Defendants made "increasingly offensive statements concerning Davidoff and Kalimantano to third parties." *Id.* ¶ 199. Third, it alleges, after Kalimantano brought its first criminal complaint in Germany, "[d]efendants drastically intensified their complaint for the purpose of defaming plaintiffs and retaliating for Plaintiffs' seeking the protection of . . . law enforcement." *Id.* ¶¶ 199, 201.

The second and third allegations are entirely too conclusory and vague to adequately plead defamation. The first allegation, however, adequately pleads elements (1)–(4): Plaintiffs

37

allege that Defendants published the false accusation that Davidoff stole the Patek Philippe watch with malicious intent.  To survive a motion to dismiss, however, the Amended Complaint must also plead either defamation *per se* or special damages.  "Defamation *per se* consists of any one of the following: (1) a statement charging an individual with a serious crime; (2) a statement that tends to injure another in his or her trade, business, or profession; (3) a statement that claims an individual has a "loathsome disease," or (4) a statement "imputing unchastity to a woman." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011) (citing *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992)).  Here, the Amended Complaint does not even suggest that Plaintiffs are attempting to plead defamation *per se*. Nevertheless, the Court considers whether the second element—a statement tending to injure another in his trade, business, or profession—may be satisfied here.

The "trade, business or profession" exception is only available when the defamation is "of a kind incompatible with the proper conduct of the business, trade, profession, or the office itself."  *Liberman*, 80 N.Y.2d at 436; *see also Van-Go Transp. Co., Inc. v. N.Y.C. Bd. of Educ.*, 971 F. Supp. 90, 98 (E.D.N.Y. 1997) ("Reputational injury to a person's business or to a company consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties.").  The Amended Complaint alleges that the website's accusation that Davidoff stole the Patek Philippe watch in the Frankfurt Transaction caused more than $1 million in damages to Kalimantano's business.  However, according to Plaintiffs, Kalimantano "is in the business of foodstuffs' wholesale and supplies to stores and customers in Germany," Am. Compl. ¶ 1, and Davidoff is one of its "operating managers and principals," *id.* ¶ 2.  Plaintiffs state that the "malicious campaign by Defendants had in fact a very negative effect on Kalimantano's and Davidoff's business, which was very

much dependent upon their public image and reputation," *id.* ¶ 208, but the Amended Complaint nowhere alleges that Plaintiffs' business substantially involves watch or jewelry sales. Courts have consistently held that any allegedly defamatory statements that do not affect a plaintiff's actual business profession, rather than simply qualities that are important for business, are not defamatory *per se*. *See Liberman*, 80 N.Y.2d at 436 (allegations that a landlord committed harassment are unrelated to his status as a landlord); *Pure Power Boot Camp, Inc.*, 813 F. Supp. 2d at 550 ("To find that a statement qualifies as one that tends to injure another in his or her trade, business, or profession, the statement must be made with reference to a matter of significance and importance for the operation of the business, rather than a more general reflection upon the plaintiff's character or qualities . . . . The allegedly defamatory statement must be targeted at the specific standards of performance relevant to the plaintiff's business and must impute conduct that is of a kind incompatible with the proper conduct of the business, trade, profession or office itself." (internal quotations omitted)); *cf. Thompson v. Bosswick*, 855 F. Supp. 2d 67, 80 (S.D.N.Y. 2012) (alleged statements made by trust employee's supervisor that employee received kickbacks for his work on the trust were presumed defamation *per se*). Defendants' alleged statements on the website do not address the specific standards of performance in the foodstuffs industry as relevant to Kalimantano, or to Davidoff in particular. The Court therefore concludes that Plaintiffs have failed to allege defamation *per se*.

The Amended Complaint also fails to adequately plead special damages. The Amended Complaint alleges vaguely that Plaintiffs suffered $1 million in harm because of the Defendants' defamatory statements on the website, but does not refer to specific transactions or business partners that were affected by the content on the website. It states that Kalimantano's business "incurred very substantial damages," Am. Compl. ¶ 100, that Davidoff's personal reputation was

"suddenly very seriously damaged," *id.* ¶ 101, and that "numerous customers either avoided buying from Kalimantano, or curtailed their accounts," *id.* ¶ 100.  No such customers are identified, however, nor do Plaintiffs provide a plausible link from which a court could infer that their loss of business was a result of the alleged defamation, let alone that such loss amounted to $1 million.  In fact, the very language used by Plaintiffs in claiming damages from the alleged defamation reveals their wildly imprecise nature—Plaintiffs state that "in light of the damage to the ongoing successful wholesale business with foodstuffs in Germany, with the international scope of trade [*sic*], *could be* assessed at over $1 million." *Id.* ¶ 131 (emphasis added).  Even Plaintiffs appear to admit that the $1 million figure is unsupported.  Like so many other claims in the Amended Complaint, this claim is devoid of *any* particularity—let alone the particularity required to demonstrate special damages.  "Special damages consist of the loss of something having economic or pecuniary value which must flow *directly* from the injury to reputation caused by the defamation[.]"  *Celle*, 209 F.3d at 179 (citation omitted) (emphasis added).  The Amended Complaint falls far short of satisfying this standard.

For these reasons, Plaintiffs' defamation claim is dismissed.

### 8.   Tortious Interference With Business Relations

To state a claim for tortious interference with business relations under New York law, the plaintiff must meet four conditions: "[1] the plaintiff had business relations with a third party; [2] the defendants interfered with those business relations; [3] the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and [4] the defendants' acts injured the relationship." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002); *see also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006).  Further, a plaintiff "must specify some particular, existing business relationship through which plaintiff would have done

business but for the allegedly tortious behavior." *Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Trust*, 688 F. Supp. 2d 229, 244 (W.D.N.Y. 2010) (citing *Minn. Mining and Mfg. Co. v. Graham-Field, Inc.*, No. 96 Civ. 3839 (MBM), 1997 WL 166497, at *7 (S.D.N.Y. April 9, 1997)).

Here, the Amended Complaint appears to allege that MIT and the Shamayevs interfered with Kalimantano's wholesale foodstuffs business by creating the defamatory website, not by the alleged breach of contract. *See* Am. Compl. ¶¶ 212–215 ("MIT and Shamayevs were aware that damaging the reputation of Kalimantano on the Internet will interfere with [its] contracts and will negatively effect [*sic*] Kalimantano's clientele base in Germany and elsewhere, including handicapping any possible trading with the U.S. counterparts in the food sector."). This claim thus duplicates the defamation claim. Nor does the Amended Complaint specifically identify any existing business relationship with which Defendants interfered. Plaintiffs thus are left with only vague and wholly conclusory allegations that cannot withstand a motion to dismiss. Plaintiffs' claim for interference with business relations is, for these reasons, dismissed.

### 9. Injunctive Relief

Finally, Plaintiffs seek a permanent injunction to get Defendants to "immediately stop making their false, malicious and virulently fraudulent attacks" on Davidoff and Kalimantano, to force Defendants to delete the website www.tofikdavidoff.com, to "withdraw and deactivate all their postings on the Internet that they undertook after June 15, 2012," and to enjoin Defendants from "carrying out their threats" to harm Davidoff and his family. Am. Compl. ¶¶ 222–224.

To obtain a permanent injunction, however, a party must show the absence of an adequate remedy at law and irreparable harm if relief is not granted. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57 (1975); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959);

*Roach v. Morse*, 440 F.3d 53, 58 (2d Cir. 2006); *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989).  As noted, Plaintiffs do not plead facts indicative of continuing criminal activity.  Further, they have not come close to pleading that there is no adequate remedy at law for their injuries, which, at bottom, result from an alleged breach of contract.  The claim for injunctive relief is, therefore, dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted as to the following counts:  Count I (civil RICO), Count III (conversion), Count V (fraudulent conveyance), Count VI (fraud), Count VII (misrepresentation), Count VIII (civil conspiracy), Count X (defamation), Count XI (tortious interference with business relations), and Count XII (injunctive relief).  Count II (for breach of contract) survives Defendants' motion to dismiss, as do Counts IV (money had and received) and IX (unjust enrichment), as alternative claims should the contract claim ultimately fail.  Plaintiffs' motion to supplement the pleadings is denied.

The parties are directed to appear in person for an initial pretrial conference before this Court on May 16, 2013, at 10:00 a.m. at the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York, 10007.  In advance of the conference, the parties are directed to meet and confer in person in an attempt to resolve disputes where possible and to prepare a discovery schedule not to exceed 120 days.  At least three business days before the conference date, the parties must submit to Chambers a proposed Civil Case Management Plan and Scheduling Order, available on the Court's website at http://nysd.uscourts.gov/judge/Engelmayer;

The Clerk of Court is directed to terminate the motions pending at docket numbers 6, 15, 20, and 23.

SO ORDERED.

_____
Paul A. Engelmayer
United States District Judge

Dated: April 12, 2013
New York, New York